ORIGINAL

530 new

FILED

**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

Name Thaing Ya
(Last) (First) (Initial)

Prisoner Number F-26942

Institutional Address P.O. Box 3471, Corcoran, California. 93212.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Ya Thaing,<br>(Enter the full name of plaintiff in this action.) | CV 08 3309<br>Case No.<br>(To be provided by the clerk of court) |
| vs. | |
| Derral G. Adams, Warden.<br>Corcoran State Prison.<br>(Enter the full name of respondent(s) or jailor in this action) | PETITION FOR A WRIT OF HABEAS CORPUS |

WHA

E-filing

(PR)

Read Comments Carefully Before Filling In

When and Where to File

You should file in the Northern District if you were convicted and sentenced in one of these counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa, San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in this district if you are challenging the manner in which your sentence is being executed, such as loss of good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

If you are challenging your conviction or sentence and you were not convicted and sentenced in one of the above-named fifteen counties, your petition will likely be transferred to the United States District Court for the district in which the state court that convicted and sentenced you is located. If you are challenging the execution of your sentence and you are not in prison in one of these counties, your petition will likely be transferred to the district court for the district that includes the institution where you are confined. Habeas L.R. 2254-3(b).



Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now and the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

(a) Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Santa Clara County Court — 191 North First St. San Jose , CA. 95113.

Court — Location

(b) Case number, if known CC459309

(c) Date and terms of sentence 4-20-06; 15 Years to life.

(d) Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.) Yes X No ____

Where?

Name of Institution: Corcoran State Prison

Address: P.O. Box 3471, Corcoran, CA. 93212.

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Contimuous sexual abuse of child under fourteen. P.C 288.5(a).

Aggravated sexual assault: P.C. 269/261.

Lewd or lascivious act on child: P.C. 288(c)(1).

3. Did you have any of the following?

Arraignment: Yes X No ____

Preliminary Hearing: Yes X No ____

Motion to Suppress: Yes ____ No ____ ?

4. How did you plead?

Guilty ____ Not Guilty X Nolo Contendere ____

Any other plea (specify) ____

5. If you went to trial, what kind of trial did you have?

Jury X Judge alone____ Judge alone on a transcript ____

6. Did you testify at your trial? Yes X No ____

7. Did you have an attorney at the following proceedings:

(a) Arraignment Yes X No ____

(b) Preliminary hearing Yes X No ____

(c) Time of plea Yes X No ____

(d) Trial Yes X No ____

(e) Sentencing Yes X No ____

(f) Appeal Yes X No ____

(g) Other post-conviction proceeding Yes ____ No X

8. Did you appeal your conviction? Yes X No ____

(a) If you did, to what court(s) did you appeal?

Court of Appeal Yes X No ____

Year: 08/23/07 Result: Judgement affirmed.

Supreme Court of California Yes X No ____

Year: 11/28/07 Result: Review Denied.

Any other court Yes ____ No X

Year: ____ Result: ____

(b) If you appealed, were the grounds the same as those that you are raising in this

petition? Yes X No____

(c) Was there an opinion? (Exh. H); Yes X No____

(d) Did you seek permission to file a late appeal under Rule 31(a)?

N/A Yes ____ No____

If you did, give the name of the court and the result:

N/A

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal? Yes ____ No X

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a) If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I. Name of Court: N/A

Type of Proceeding: ____

Grounds raised (Be brief but specific):

a. ____

b. ____

c. ____

d. ____

Result: ____ Date of Result: ____

II. Name of Court: N/A

Type of Proceeding: ____

Grounds raised (Be brief but specific):

a.__________

b.__________

c.__________

d.__________

Result: __________ Date of Result: __________

III. Name of Court: N/A

Type of Proceeding: __________

Grounds raised (Be brief but specific):

a.__________

b.__________

c.__________

d.__________

Result: __________ Date of Result: __________

IV. Name of Court: N/A

Type of Proceeding: __________

Grounds raised (Be brief but specific):

a.__________

b.__________

c.__________

d.__________

Result: __________ Date of Result: __________

(b) Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes ____ No X

Name and location of court: __________

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

need more space. Answer the same questions for each claim.

[Note: You must present ALL your claims in your first federal habeas petition. Subsequent petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

Claim One: See, next page 6-A to 6-E.

Supporting Facts:

Claim Two: See, next page; 6-E to 6-I.

Supporting Facts:

Claim Three: See, next page; 6-I to 6-K.

Supporting Facts:

Claim Four: See, next page; 6-K to 6-M.

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

This is proper Court of Review. All Claims have been exhausted to lower courts.

CLAIM ONE

Petitioner was denied Due Process and Fair Trial when the trial Court committed prejudicial error in responding to the Jury's question about consent. In the alternative, trial Counsel was Ineffective for failing to request a further instruction on the meaning of consent.

SUPPORTING FACTS

The Government contends that over a 7 year period, Petitioner committed aggravated sexual assault of a 9 year old girl up until she turned 15 or 16 years of age.

During trial, Tara Doe, the victim, (hereafter Tara), testified to several different instances of sexual contact with Petitioner. (Refer to, 2 RT, p. 120, 145, 175-176, 185, 192-199, 200; 3 RT, p. 226).

The Government's case was essentially that Petitioner, by "force, violence, duress, menace or fear of immediate and unlawful bodily injury on the person or another" accomplished the intercourse. (Citing Penal Code, § 261 (a)(2); California Jury Instruction 1000; 1 CT, p. 170-171; 4 RT, 446-447).

An important legal issue at trial was whether Tara "consented" to intercourse with Petitioner. Subsequently, the Jury found Petitioner guilty of 3 of the 4 counts against Petitioner.

For the Defense, Petitioner testified that there was several acts of sexual intercourse, but that he did not use force and that Tara in fact consented to the intercourse. (Refer to, 4 RT, p. 406-408, 411, 413 & 417). To support Petitioner's defense of consent, Petitioner said at no time did Tara ever indicate that she did not want to have intercourse and that she never tried to stop any advances (Refer to, 4 RT, p. 411). Additionally, much of Tara's actual ....

...testimony supports Petitioner's defense of "consent" and Tara did testify that Petitioner did not use any force against her. (Refer to, Exhibit E, p. 84, et seq.).

At end of trial, the Court read California Criminal Jury instructio 1000, (hereafter CalCrim No), and CalCrim No 1123, which defines what the prosecution must prove, especially in terms of the "consent" issue

As stated above, Petitioner was found guilty of 3 of the 4 more serious counts against him and sentenced accordingly.

The issue for this Court to decide is if Petitioner was denied Due Process and Fair Trial because the Trial Court committed prejudicial error by failing to properly respond to the Jury's question about "consent."

Petitioner was convicted in Count II, of having committed the aggravated sexual assault of a child, Penal Code 269, based on the predicate offense of forcible rape, Penal Code 261 (c)(2). As an alternative to Count II, Petitioner was charged in Count IV, with committing lewd or lascivious acts on a child under age 14; P.C. 288(a a lesser offense to Count II.

Had the Jury been properly instructed regarding the question of "consent," there is a reasonable liklihood the Jury would have found Petitioner guilty of the lesser offense in Count IV supra, rather than the more serious offense in Count II, because the evidence that was produced at trial supported the lesser offense in Count IV.

The Jury was given CalCrim No 1000, herein at Exhibit A, (1 CT, p. 170-171). In this instruction, the portion that defines "consent" refers to a "female must act freely and voluntarily and know the nature of the act." During deliberations, the Jury submitted the following question to the Judge; "we have a question regarding ....

...consent. The law refers to a "woman" giving consent. Can a 13 year old give consent at all by law ?" (See, Exhibit B, 1CT 191A). In response, the Judge only wrote back stating "please refer to instruction 1000 on page 21, 'consent' as there defined refers to any female." (See, Exhibit B, 1CT, 191A, Judges note).

Petitioner contends the Judge's response regarding a 'woman giving consent' was prejudicially inadequate. The Court should have been more thorough to answer the confusion by the Jury by stating "yes, a 13 year old can give consent." Just as important, the Court should have explained any conflict in the instructions because "consent" is no defense to the charge in Count IV of lewd and lascivious conduct, but it was a defense to the more serious charge of aggravated sexual assault.

Since the Jury may have had doubt regarding the testimony of Tara and whether there was actually some consent, and equally was confused about the Jury instruction regarding consent, it is more than likely the Judge's lack of response and minimal clarification allowed the Jury to convict on the more serious offense in Count II.

In the alternative, trial counsel was Ineffective under the Sixth Amendment Right to effective counsel for failing to request a further instruction on the concept of concent as to Count II. The Attorney's failure fell below an objective standard of reasonableness decided in Strickland v. Washington, (1984) 466 U.S. 668.

It is evident the prejudice to Petitioner was conviction of the more serious count which carried a harsher sentence.

The United States Supreme Court, in Bollenbach v. U.S. (1946) 326 U.S. 607, held that, "when a jury makes explicit it's difficulties" by, for example, asking a question, the trial court "should clear....

... the Jury's difficulties away with concrete accuracy..." Id. 612-613.

The Ninth Circuit Court of Appeals has made clear in several cases that instructional errors constitute a deprivation of the Federal Constitutional right to Due Process and Fair Trial. Citing, Beardslee v. Woodford, (9th Cir. 2004) 358 F.3d 560,575, and McDowell v. Calderon, (9th Cir. 1997) 130 F.3d 833,839. Specifically, in McDowell, supra, the Court found that'Bollenbach places on the trial judge a duty to respond to the jury's request with <u>sufficient specificity</u> to clarify the jury's problem.' In Gregg v. Georgia, (1976 428 U.S. 153, the high Court stated, " it is quite simply a hallmark of our legal system that juries are carefully and adequately guided in their deliberations." Id. p. 193.

In Estelle v. McGuire, (1991) 502 U.S. 62, the high Court's question for an instruction is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates Due Process." Id. 72.

In this case, the answer is affirmative since, A) the evidence testified and produced at trial supported a lesser included offense conviction; and B) the failure of the trial court to cure the instruction and jury's confusion and request, resulted in conviction of count II, rather than count IV; and C) additionally, to compound the court's error, during closing arguments, the prosecutor <u>mistated</u> improperly the law by telling the jury that Tara could not "legally consent" and therefore, reducing the Prosecution's burden of proof. (Exhibit C, 4RT, 495); and D) the Constitutional guarantee to Due Process entitles Petitioner to a fair trial under the Fifth and Fourteenth Amendment to the U.S. Constitution. Here, the trial ....

... court violated it's duty to help the jury understand the legal principles of this case and therefore denied Petitioner a fair trial by <u>not</u> clarifying "consent" to the jury when ample evidence existed to convict on the lesser count IV.

Simply, the jury could have had reasonable doubt as to whether the prosecution proved beyond a reasonable doubt that the acts were nonconsensual and hence, a properly instructed jury could have found Petitioner <u>not</u> guilty of Count II.

Respectfully, the error was prejudicial and this Court should reverse.

<u>CLAIM TWO</u>

Petitioner was denied Due Process and Fair Trial as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution when the Prosecutor engaged in two instances of prosecutorial misconduct.

<u>SUPPORTING FACTS</u>

First, the prosecutor committed misconduct by mistating the law on consent, an element of the offense which subsequently absolved the prosecution of it's obligation to convict Petitioner with proof beyond a reasonable doubt on <u>all</u> the elements of Count II.

In order to prove to the Jury that Petitioner was guilty of Count II, aggravated sexual assault, forcible rape on a child under 14 and 10 or more years, (P.C. 269/261), (hereafter Count II), the District Attorney had to prove beyond a reasonable doubt, that Tara did not consent to the acts Petitioner was charged with. In fact, the purpose of the Court's Jury instruction of CalCrim 1000, was to inform the Jury that "consent" or lack thereof, must be a necessary finding to convict Petitioner of Count II.

During closing arguments, defense counsel argued that Tara ....

...consented to having intercourse with Petitioner and therefore was not guilty of Count II. (See, Exhibit D, 4RT, p. 482-484, Counsel's closing).

The Prosecution responded at closing by stating that Tara didn't "have to let him know' and that she 'can't consent legally' ...'how could she consent, that's impossible..." (See, Exhibit C, 4RT, p.495).

This deliberate misconduct by the prosecution was crucial to the jury's finding Petitioner guilty of Count II; as previously stated, the Jury was already confused whether a 13 year old 'woman' could consent and sent a note to the Court asking for clarification and resolve. (Exhibit B). Not only did the Court fail to clarify the previous question, The Court failed to correct this mistatement and misconduct by the prosecution when the error appeared.

Secondly, there was ample evidence that pointed to Tara's consent to the intercourse as her own testimony reveals.(Exhibit E, p.84,et seq) Therefore, it was imperative that the prosecutor should not have mistated the law as to consent because it allowed the Jury to convict Petitioner of Count II by a lesser standard of proof and not beyond a reasonable doubt. Had the Jury not been exposed to this misconduct, the Jury could have convicted Petitioner of Count IV, since the evidence supported Count IV.

The Due Process Clause of the Fourteenth Amendment requires the prosecution to bear the burden of proving beyond a reasonable doubt every element essential to the crime. In re Winship, (1970) 397 U.S. 358. Since Petitioner is entitled to proof beyond a reasonable doubt, the prosecution's misconduct was contrary to U.S. Supreme Court precedent as provided in Winship, supra, and also entitles Petitioner relief based on the standard set forth in 28 U.S.C § 2254(d)(1).

(next pg)

Petitioner is also entitled to relief based on the Federal Habeas standard set forth in 28 U.S.C. § 2254(d)(2), because looking back to the last reasoned State Court opinion, (Ylst v. Nunnemaker, (1991) 501 U.S. 797), the State Court of Appeals opinion in denying the Petitioner relief, stated "there was no issue whether victim gave legal consent." (See, Exhibit F, p. 28, ln. 12, Court of Appeal Opin.)

This opinion was clearly an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding. § 2254 (d)(2).

The facts are that the trial Judge read a Jury instruction that attempted to "define consent" of intercourse with a 13 year old woman; (Exhibit A ; also, 4RT, p. 446-447); Petitioner's own testimony was that the intercourse was consensual. (Exhibit G, p. 346, et seq.). During closing argument, it was defense Counsel's position that Petitioner had consensual intercourse. (Exhibit D); The prosecution felt it necessary to mistate the law of consent by rebutting defense counsel's closing argument that Tara could even consent by law. (Exhibit C). Finally, the Jury sent the Judge a note asking for a "legal" definition of consent. (Exhibit B). Therefore, the State Court of Appeal opinion was/is contrary and unreasonable determination of the facts produced at the State Court proceeding. § 2254 (d)(2).

Since the Jury instruction, CalCrim 1000, was a "legal" definition as applied to Count II, Petitioner was denied Due Process and Fair Trial due to the error and relief should be granted.

The second instance of misconduct appeared during trial testimony, when the prosecutor elicited testimony from a detective Wharton, whom "vouched for the credibility and truthfulness" of Tara's actions and participation in helping the detective make a tape-recorded phone ....

... call to the Petitioner. Detective Wharton testified that people who place pre-text calls are more willing to see the prosecution to the end and that these people tend to be truthful. (See, Exhibit H, 3RT, 236-237).

The inference to the Jury in this statement is clear. Because Tara agreed to help in placing a tape-recorded call to Petitioner, then she must be honest and truthful. This elicited statement was clear error. This sort of misconduct violated Petitioner's Due Process to the U.S. Constitution because the error lowered the prosecution's burden of proof beyond a reasonable doubt to every element of the crime. In re Winship, supra. Further, the record did not establish that detective Wharton was an expert on judging the credibility or truthfulness of persons who provide information or mere assistance during investigations. He could not with certainty, account for Tara's truthfulness and credibility.

Additionally, the Court of Appeals decision agreed that Detective Wharton's opinion was 'not admissable...and irrelevant.' (See, Exhibit F, p. 29, ln. 21-24; p. 30, ln. 19-26); also, the Court of Appeal opinion held this kind of misconduct (the Detective's testimony), was "improper." (Exhibit F, p. 31, ln. 4-9). This agreed upon error was an unreasonable determination to ultimately denying Petitioner relief and requires Federal relief under the standard provided in 28 U.S.C. § 2254 (d)(2), when a Court makes an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Id.

At a minimum, Petitioner claims trial counsel was Ineffective for failing to object to this testimony because it allowed the jury to be exposed to testimony it was otherwise barred by law from ....

... hearing in both instances of misconduct. Under the Strickland standard supra, "when a defendant challenges a conviction, the question is whether there is a reasonable probility that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland supra, at 466 U.S. 695. By Tara's own testimony that Petitioner did not force her to have intercourse, the Jury had ample 'doubt' to find Petitioner guilty of the lesser offense. Since trial counsel failed to object to both instances of the prosecution's misconduct, it allowed the jury to mistakenly ignore "non-force" testimony and hold the prosecution's mistatement of law and the detective's vouching, as truth of the matter. When combined, this resulted in a fundamentally unfair trial.

Prosecutorial misconduct in argument may violate the Federal Constitution when it infects the trial and makes a conviction a denial of Due Process. Citing, Donnelly v. Dechristoforo, (1974) 416 U.S. 637

Respectfully, such is the case as to Ground Two, and Federal Habeas relief should be Granted.

CLAIM THREE

Petitioner's Constitutional Right to Due Process and Fair Trial were violated when the trial Court failed to instruct the Jury on the definition of the term "menace" in California Penal Code Statute, § 261.

SUPPORTING FACTS

Under the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, a criminal defendant has a right to a Jury's findings beyond a reasonable doubt as to all elements of a charged crime. Citing, Estelle v. Mcguire, (1991) 502 U.S. 62,69. Likewise, a Defendant is also entitled to sua sponte Jury instructions ....

... correctly defining the elements of the crime. Carella v. Californi (1989) 491 U.S. 263, 265. Additionally, Due Process "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, supra, at 364.

The issue in this Ground for this Court is whether the trial court should have defined to an "already ambiguous" Jury, the meaning of the term "menace" as stated in California Penal Code, 261 (c), which is described as "any threat, declaration, or act which shows an intention to inflict an injury upon another."

During Petitioner's trial, his main defense was that Tara consented to sexual intercourse and as Petitioner also admitted to the act, Petitioner strongly denied using force, violence or <u>menace</u>, duress or fear. (See, Exhibit G, p. 346, et seq. ---- also, Exhibit D).

Simply, any evidence of force or threat, etc, was not testified to during trial and therefore the Jury could have had reasonable doubt whether Petitioner accomplished any intercourse through force, violenc or menace.

Additionally, Petitioner asserts the State Legislature intended the word "menace" in the statute to have a particular <u>legal</u> meaning and therefore the trial court should have defined/explained the terms legal meaning. For example, in People v. Griffen, (2004) 33 Cal. 4th 1015, the State Supreme Court determined that the term "force" in a forcible rape prosecution had a <u>common</u> meaning; therefore, the trial court had no sua sponte duty to define this term. However, the State Court also determined that in 1990, the Legislature added "duress and menace" to Penal Code 261, and also added subdivisions (b) and (c), to specifically define those terms. (Citing, 1990, ch. 630, § 1, ....

... p. 3096); Griffen supra, at 1023 and 1028.

Since the Legislature saw fit to define menace in this Statute, the trial court should have defined the legal meaning because the trial court also instructed the Jury that in order to find Petitioner guilty of aggravated sexual assault of a child based on forcible rape, they must find Petitioner "accomplished the act by force, violence, duress, menace..." (Exhibit A, 1CT, p. 170-171). Also, the lack of understanding of the legal term "menace" in the Jury's minds and deliberation process, gave way to conviction of the most serious count rather than the lesser count.

Because the word menace in Penal Code 261, is part of the facts and charging elements of the crime charged in the most serious count II, the trial court erred in failing to define the term which allowed conviction based on a lesser burden of proof than that opposite of the standard set forth in In re Winship, supra. Likewise, Petitioner is entitled to instructions correctly defining elements of the crime. Citing, Carella v. California, supra.

The error resulted in a decision that was contrary to...clearly established Federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254 (d)(1).

Respectfully, relief shoud be Granted.

## CLAIM FOUR

Petitioner was denied his Constitutional Right to Due Process and Fair Trial because the trial court failed to instruct in compliance with People v. Dewberry, (1959) 51 Cal. 2d 548, where evidence would support such instruction.

## SUPPORTING FACTS

The central question in this claim is that had the Jury been ....

... properly instructed with a "Dewberry compliant instruction" regarding both a lesser offense to Count I, and an alternative lesser charge to Count II, there is a reasonable probability that Petitioner would have been convicted of only the lesser offense.

In People v. Dewberry, (1959) 51 Cal. 2d 548, (hereafter Dewberry), the State Supreme Court held that a defendant is entitled to the benefit of a Jury's reasonable doubt with respect to all crimes with lesser degrees or included offenses. Id. at p. 556. Specifically, the Court also held, "When the evidence is sufficient to support a finding of guilt of both the offense charged and a lesser included offense, the Jury <u>must</u> <u>be</u> "instructed" that if they entertain a reasonable doubt as to which offense has been committed, they <u>must</u> find the defendant guilty only of the lesser offense. Id. at p. 555.

What makes this claim a Federal determination is that the Dewberry principle is founded on the reasonable doubt standard under State Constitutional principles which invoke Petitioner's Due Process rights under the Federal Constitution including a Fair Trial. Failing to give such an instruction implicates Federal Constitutional protections

In Hicks v. Oklahoma, (1980) 447 U.S. 343, the High Court held where the State provides the defendant with a specific statutory or <u>decisional</u> right, he acquires a Due Process right under the Federal Constitution which the State cannot arbitrary deny. Id. at p. 346.

In this case, both Counts I and II, had lesser included offenses, and each Jury instruction to both counts, (Exhibit I, CT. 173-175), lacked any direction or explanation that if the Jury had reasonable doubt as to whether Petitioner committed the greater or lesser offense, they were required to convict Petitioner of <u>only</u> the lesser Offense. Dewberry supra, requires this finding. (next pg)...

In support of there being sufficient lesser offense evidence, Petitioner's main defense at trial was that he did not use force, violence or menace, etc, to have intercourse with Tara. (Exhibit G, E,& Exhibit D). There was also closing testimony that Tara consented to the intercourse. (Exhibit E). Additionally, Tara gave conflicting information to police in addition to changing her testimony at trial from what she originally told investigators. (See, i.e. 2RT, p. 105-106, 179; vs. 2RT, p. 183-184 & 3RT, 244; also, 2RT, 210; 3RT, 336; 2RT, p. 143).

In light of this evidence, the prejudice to Petitioner is clear; had the Jury been properly instructed under Dewberry supra, and that they must resolve any reasonable doubt in favor of the lesser offenses of Count I and II, there is a reasonable probability, given the lack of force evidence, Petitioner would have been convicted of the lesser offense. Clearly, the wording of the Dewberry principle/instruction was critical to the Jury's findings.

Respectfully, the Court should Grant the petition as to this Claim, and three other claims herein.

Respectfully Submitted,

Dated: June 29th 2008.

Ya Thaing.
Petitioner, Pro se.

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

(See factual arguments, Page 6 to 6-M.

Do you have an attorney for this petition? Yes____ No X

If you do, give the name and address of your attorney:

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on June 29th 2008.

Date

[signature]

Signature of Petitioner

Ya Thaing. Pro se.

(Rev. 6/02)

EXHIBIT "A"

1. The defendant committed Rape on another person;

AND

2. When the defendant acted, the other person was under the age of 14 years and was at least 10 years younger than the defendant.

To decide whether the defendant committed Rape, please refer to the separate instructions that I will give you on that crime.

**1000**

To prove that the defendant is guilty of rape, the People must prove that:

1. The defendant had sexual intercourse with a female;

2. He and the female were not married to each other at the time of the intercourse;

3. The female did not consent to the intercourse;

AND

4. The defendant accomplished the intercourse by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the female or to someone else.

*Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis. Ejaculation is not required.

To *consent*, a female must act freely and voluntarily and know the nature of the act.

Intercourse is *accomplished by force* if a person uses enough physical force to overcome the female's will.

*Duress* means a direct or implied threat of force, violence, danger, or →

retribution that would cause a reasonable person to do or submit to something that she would not do or submit to otherwise. When deciding whether the act was accomplished by duress, consider all the circumstances, including the female's age and her relationship to the defendant.

Intercourse is *accomplished by fear* if the woman is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it.

The defendant is not guilty of rape if he actually and reasonably believed that the female consented to the intercourse. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the female consented. If the People have not met this burden, you must find the defendant not guilty.

**1112.**

The defendant is charged in Count Three with a lewd or lascivious act on a 14- or 15-year-old child who was at least 10 years younger than the defendant.

To prove that the defendant is guilty of this crime, the People must prove that:

1. The defendant willfully touched any part of a child's body either on the bare skin or through the clothing;

2. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child;

3. The child was 14 years old at the time of the act;

AND

4. When the defendant acted, the child was at least 10 years younger than the defendant.

E X H I B I T  " B "

Redacted Copy

Received by: Fausto Banuelos
Date: 12-16-05
Time: 4:55

Jury Note # 2

**IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF SANTA CLARA**

THE PEOPLE OF THE STATE OF CALIFORNIA
Plaintiff,
PEOPLE

vs

YA THAING
Defendant,

No. CC459309

FILED
DEC 16 2005
KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA County of Santa Clara
BY [signature] DEPUTY

We, the jury in the above-entitled cause, request the following:

WE HAVE A QUESTION REGARDING CONSENT. THE LAW REFERS TO A "WOMAN" GIVING CONSENT. CAN A 13 YEAR OLD GIVE CONSENT AT ALL BY LAW?

Please refer to instruction #1000 on page 21. "Consent" as there defined refers to any female

Date:

Juror #4
Foreperson

Print Name

191A

E X H I B I T " C "

get to that conclusion based on the facts he is talking about, because I don't think you can. I don't think it's worthy of spending too much time about it.

Now Mr. Gillan also says Tara did not let the defendant know that she did not consent. First of all, she doesn't have to let him know. She has to be -- she doesn't have to tell him outwardly. He can read the signs of her. And what's the first obvious sign? She is 13. She can't consent legally. I mean, how could she consent? That's impossible. So let's just start with that. Point two. He ignores she was crying during the act of sexual intercourse in the van. Tears were coming down her eyes.

MR. GILLAN: Objection, states facts not in evidence.

THE COURT: Well, I'm going to overrule the objection and just remind the jury that what the attorneys say is not evidence. If the attorneys mention a fact or piece of evidence that is different from what you recall the evidence to be, rely on your recollection of the evidence.

MR. BRAKER: She told you, or according to my notes, she tried to. I asked the police officer about this statement what happened in the middle of the van sexual episode and how she said she tried to push him off on his chest but couldn't stop him. That's how she is letting him know.

What is reasonable for her to think? She is alone with him on the side of the road with no one around. All of those things are what should be considered in the analysis

EXHIBIT "D"

one thing that conveniently Mr. Braker didn't point out to you when he was telling you all about the instructions. Maybe you will be able to figure out why he didn't point this out to you.

It says the defendant is not guilty of rape if he actually and reasonably believed that the female consented to the intercourse. The People, that's him, have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the female consented. If the People have not met this burden, you must find the defendant not guilty.

What does that mean? That means that if all objective evidence suggested that Tara was consenting to Ya, and that's what he believed, and he had intercourse with her, if she secretly didn't want to have sex with him but didn't let -- didn't do anything to suggest it and he had, and he believed that the sex was consensual -- you can't convict him of rape.

Only way you can convict him of rape number, one, it was against her will and, number two, he didn't believe it was consensual. What evidence has Tara given us from the witness stand to suggest that she let Ya know that it was not consensual? Matt's going to say that she told the police something in an interview that she didn't testify on the witness stand. But she testified on the witness stand that there were no threats, there was no force, there was no -- she didn't resist. She took off her own clothing. She put her own clothing back on. She went to the bathroom

on her own volition, went to the back of the van on her own volition. She removed the clothes on her own volition. She stroked Mr. Thaing's penis on her own volition. She stopped on her own volition.

They engaged in intercourse without saying no. And the only reason she didn't tell her sister is because she was afraid her sister wouldn't believe her. Not that Ya was going to harm her. So what did -- what evidence is there to suggest that Ya Thaing knew that it was against her will? Knew that it wasn't consensual? What evidence? There has -- and not only what evidence that's just okay. There is no evidence.

But the burden of proof is on the prosecution to prove beyond a reasonable doubt that my client knew it wasn't consensual. Right. And if there is no evidence, he doesn't even get in the ballpark. It's a different world that he's living in. But the world that Matt was living in or Mr. Braker was living in, it left out this, the defendant and what his belief was.

So once again, to repeat myself, what did Tara testify on the witness stand? She was never threatened. That Ya never used physical force. There was no violence, that the intercourse caused no bleeding and no discharge, that she fully cooperated in both incidents of sexual intercourse, that there was no past behavior to suggest that she was in danger in any way, that she was not afraid of Ya.

That when Ya touched her, it was gentle and that she did not report because, number one, the grandmother

would think that she was -- that she wanted to have sex with Ya. Once again, not a fear of harm. Two. Her parents wouldn't believe her. Once again, not a fear of harm. That they wouldn't believe her. Once again not a fear of harm.

Fear of harm is not a reason that she didn't report this. There was fear that they wouldn't believe her or fear that she maybe had some sexual designs on Ya. And every visit to Ya's residence was initiated by her, right.

By the way, before the van incident, she specifically asks her permission to go with him. And another important thing is John Som, her brother, testified that she was always friendly around Ya. There was never anything between them. They were -- they always interacted well.

Right. She said that when Ya would come over, she would stay in her room, but she demonstrated no fear, seemed to get along well, wanted to go to Ya's house. There is nothing that the brother noticed to suggest that she was afraid of Ya. And she never demonstrated that she was afraid of Ya in front of her family. Why would she? I mean, he never disciplined her. He's never raised a hand to her. He's never given her a cross word. For goodness sake.

That's what the witnesses testified about. But all -- everyone has motives when they testify. Everyone has their own interests. Tara obviously was upset about her brother's death and at least told Ya that she holds him responsible for not allowing Da to stay with him. But I mean, we are just speculating. Everyone has their motives.

E X H I B I T  " E "

duly sworn, was examined and testified as follows:

THE COURT: I do want to remind you during testimony you are not to attempt to communicate or attempt to take part in the testimony in any way.

Do you understand?

THE SUPPORT PERSON: Yes.

THE COURT: Very well. Will you please tell us your first name only and spell it.

THE WITNESS: My first name is Tara. T-A-R-A.

THE COURT: You can proceed.

DIRECT EXAMINATION

Q. MR. BRAKER: Good morning, Tara.

A. Good morning.

Q. How are you feeling right now?

A. Okay.

Q. Are you nervous?

A. Yes.

Q. How nervous are you?

MR. GILLAN: Your Honor, could I ask the witness move a little bit closer to the microphone. I'm having a difficult time --

THE COURT: Mr. Braker, why don't you help by adjusting that microphone. It is hard to hear.

I'll ask you to keep your voice up and angle it up, Mr. Braker.

Thank you.

MR. GILLAN: Thank you.

Q. MR. BRAKER: I was just asking you how nervous are you

Q. When he was doing that to you, what were you thinking or feeling?
A. After?
Q. During.
A. During. I don't know. I felt like why is he doing this to me. I haven't done nothing to him like in a bad way. Why I deserve this.
Q. Were you crying?
A. I was tearing.
Q. Did you say anything out loud to him about stopping or don't or anything like that?
A. No.
Q. Why not?
A. I'm scared he might slap me.
Q. So when he got off of you and you said he ejaculated into something, what's the next thing that happened?
A. After?
Q. Yes.
A. Ejaculate?
Q. Yes.
A. Then he stopped and he drove to his apartment.
Q. After he got off of you, what did you do next?
A. I just put my pants back on and I just I got dressed and I went and sat in the front.
Q. Did he say anything to you?
A. No.
Q. Did he tell you where to sit?
A. No.

A. I'm not sure.

Q. Were you afraid of him at any time?

A. When it happened?

Q. After it started happening, after he started -- after the first time that he touched you, when you say he touched your breasts all the way up until the last time something happened, were you afraid of him?

A. I wasn't afraid of him but when it happened, like what he done, when it happened I'm afraid of him.

Q. I'm not understanding.

A. I'm not afraid of him.

Q. Okay. Did he ever say anything to you that scared you?

A. No.

Q. Did you ever tell his -- your sister what he had been doing?

A. Yes, I did.

Q. Well, while it was happening -- I'm sorry. While the time you were staying at his house?

A. No.

Q. During the summers did you tell her?

A. No.

Q. Why not?

A. Because if I told her when it happened, she is going to think I'm lying or --

Q. You have told us about things that happened at his house in Stockton and in the van. Did anything happen here in San Jose?

pants.

Q. Okay. And after that what happened?

A. And then he would take off his pants and he would just get on top.

Q. What happened to your clothes?

A. He took -- I just took it off.

Q. Took off what?

A. My sweats.

Q. Why did you do that?

A. Because I told you, I was scared because I was home alone. My parents weren't home.

Q. Where were they?

A. They were out at a friend's house.

Q. Did he tell you to take off your pants and your underwear?

A. I know because I know what he does want or what he wants to do, because every day I know what he would do, come home alone. If I yell or scream, there is no one there that they could hear, you know.

Q. Had he ever said something to you that made you think he might hit you or hurt you?

A. No. When I file for the report, he said, oh, if I tell the family or his wife, he would kidnap me or, you know, and take me with him.

Q. Okay. When did he say that?

A. When the last time he went to my mom's house, like in August. That was the last time.

Q. Okay. August of this year?

A. Yes.

Q. Okay. You testified on direct examination that Ya never disciplined you, is that true?

A. Yes.

Q. So Ya never laid a hand on you in anger?

A. No.

Q. I'm sorry. Did Ya ever lay a hand on you in anger?

A. No.

Q. Did Ya ever threaten you in any way?

A. Before this incident happened or --

Q. I'm sorry. You indicated that at some point you had a phone conversation with him and he said that he would -- if you told on him, that he was going to take you with him, is that right?

A. Yes.

Q. Other than that, did he threaten you in any way?

A. No.

MR. BRAKER: Objection, I'm going to ask it be stricken because I think it's vague. Threaten her, I don't know what her definition --

THE COURT: The objection is overruled. You can cross examine.

Q. MR. GILLAN: You answered that he never threatened you?

A. No.

Q. I'm sorry. I'm confusing you and myself. Did he ever threaten you?

A. No.

A. I don't remember in the bedroom what I told the district attorney.

Q. I'm just asking you not what you told him.

Just asking you if you remember what happened in the bedroom.

A. That I was lying down with his son.

Q. Just yes or no if you remember?

A. Yes.

Q. On direct examination -- I'm just talking about the van incident right now. Okay?

A. Okay.

Q. You told the district attorney that you were scared, is that right?

A. Yes.

Q. Did Ya threaten you in any way in the van?

A. No.

Q. Did he use any physical force to get you into the back of the van?

A. No.

Q. Did he -- had he harmed you in the past in any way?

A. No.

Q. Had he done anything to anybody in your presence that made you think he was a violent person?

A. Well, when like I see him mad at his kids, I see he hit his kids. That I see with my own eyes.

Q. What did he do, spank them?

A. Yes.

Q. Had he ever spanked you?

A. No.

Q. Did he ever threaten to spank you?

A. No.

Q. Had he ever given you a time out?

A. No.

Q. Okay. Did he carry around weapons?

A. No, not that I know of.

Q. On direct examination you said that when -- that Ya came around to your side of the van, is that right?

A. Yes.

Q. And he opened the door, is that right?

A. Yes.

Q. And then I guess he put his hand on your wrist, is that right?

A. He would open the passenger door and put his hands on my breast first.

Q. And then he touched your wrist, is that right?

A. After we got into the sliding door in the back.

Q. He sort of led you to the back of the van, is that right?

A. Yes.

Q. You said that he was gentle, is that right?

A. When he pulled my wrist he was gentle.

Q. Okay. What does that mean?

A. He wasn't like -- he didn't force me to go in the back. He didn't yell at me or nothing.

Q. So he just led you to the back of the van?

A. Yes.

E X H I B I T "F"

COPY

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

Court of Appeal - Sixth App. Dist.
FILED
AUG 23 2007
MICHAEL J. YERLY, Clerk
By ______ DEPUTY

THE PEOPLE,

Plaintiff and Respondent,

v.

YA THAING,

Defendant and Appellant.

H030143
(Santa Clara County
Super. Ct. No. CC459309)

Defendant Ya Thaing was found guilty at jury trial of three sex crimes against a child and was sentenced to 15 years to life in state prison. On appeal, he claims he was deprived of due process and a fair trial because of erroneous jury instructions, prosecutorial misconduct, and possible incompetence of counsel.

FACTS

Victim was 18 years old and living at home with her parents in San Jose at the time of defendant's trial. During the summers between Victim's ninth and 15th or 16th years, she spent between two weeks to a month each year visiting her adopted oldest sister A.T. and A.T.'s husband, defendant, in their home in Stockton where they lived with their four children and defendant's aunt,[1] who was called "grandma."

[1] Grandma testified that she raised defendant from infancy.

**Count 1, Continuous Sexual Abuse of a Child Under 14, Penal Code Section 288.5, Subdivision (a),[2] in Defendant's Bedroom Between April 26, 1996, and August 30, 1998**

In 1996, when Victim was nine years old, A.T. and her family lived in a two-story, two-bedroom house. According to A.T., defendant and she slept in the master bedroom upstairs with two of the children and with Victim when she visited. "Grandma" slept in the small room upstairs and the two small children slept in the big room downstairs.

Victim testified that five days a week, when defendant was on his way to work around 4:00 or 5:00 a.m., he began stopping by the downstairs room where she slept with her nieces and nephews on the floor. He would fondle her breasts and even if she turned away, defendant would continue touching her. Everyone else would be asleep, and if any of the children started moving, defendant would stop. He would also touch Victim's breasts over her clothes while she was watching television when other family members were not around.

**Count 2, Aggravated Sexual Assault of a Child Under 14 and 10 Years Younger Than the Defendant, Section 269, and its Lesser Included Offense, Lewd and Lascivious Acts on a Child Under 14, Section 288, Subdivision (a), Between September 1, 1998, and April 25, 2001**

When Victim was 11, 12, and 13 years old, and in middle school, she slept in A.T.'s and defendant's bedroom on a sheet on the floor next to the bed of the youngest son. A.T. worked at night and had told Victim that whenever A.T. was at work, Victim was to "take care of her son, the youngest son, sleep with him." On one occasion when everyone else was sleeping and A.T. was at work, defendant touched Victim's breasts and took hold of her wrist. She got up and defendant led her to the bathroom, locked the door, and turned on the water. Victim was wearing a shirt, bra, underwear, and a floor-length, wrap-around "home skirt" similar to a sarong or a kimono. Defendant

[2] Further statutory references are to the Penal Code unless otherwise stated.

pulled Victim's underwear down a little and she freed one foot. He pulled down his pants and underwear, picked up her thigh and put one foot on top of the toilet. He held her by the waist, and penetrated her vagina with his penis. Victim was scared and did not yell or try to stop him because the grandma was sleeping in the bedroom next to the bathroom and Victim was afraid that she might mistakenly believe that Victim was "doing something to him, too." After the act of sexual intercourse, Victim went back to defendant's room and lay down next to the youngest son because A.T. had told her to sleep with him.

Victim also remembered having sex with defendant in his bedroom "more than two times . . . whenever the wife is at work, . . . I would sleep with the youngest son upstairs." They followed the usual scenario. Defendant would touch her breast, pull her by the hand, and she would lie down on the bed with him and he would lie next to her. She "wasn't afraid of him but when it happened, like what he had done, when it happened I'm afraid of him." He never said anything that scared her. She did not tell her sister what he had done while she was staying at the house because Victim was afraid her sister would think she was lying.

When Victim was 13 years old, and in the eighth grade, she went to defendant's house in Stockton during Christmas break because defendant said A.T. wanted her to go there. At that time, defendant was working as a security guard in San Jose during the week and staying at Victim's parents' house. On that occasion, although she did not want to go with defendant, her mother, who did not know what defendant had done, told her to go, so she accompanied defendant to Stockton in his van.

On the way, defendant pulled off the road out of sight by a red bridge where people go fishing. He squeezed Victim's breast. She was afraid he would hit her if she resisted because he was so big. He took her by the arm and pulled her "gent[ly]" to the back of the van and pushed a button on a seat which opened into a bed. Victim complied

because she did not know what he would do to her if she resisted. In the back of the van, defendant placed her hand on his soft penis "like jack him off." She stroked him a little and the penis got hard. Victim stopped stroking him and pulled her pants and underwear down to the ankles. She was scared because there was no one around. She already knew what he wanted; he gave her a sign. She lay on her back, defendant got on top of her and although she tried to push him away, "he forced himself back." She did not tell him to stop because she was afraid he might slap her. Defendant withdrew his penis and ejaculated. Victim was "tearing" but not crying. She did not know why she deserved this treatment when she had done nothing bad to him. She put her pants back on and got into the passenger seat. They arrived at defendant's house about 30 minutes later. Victim did not tell A.T. what happened because she did not think A.T. would believe her.

There were also incidents in Victim's home in San Jose while defendant was staying there in her brother's room (the latter was living with a girlfriend). On one occasion, defendant came to Victim's room at night while her parents were at a friend's house. She was sleeping. He locked the door, got into her bed, and started touching her breasts and vagina. He then got on top of her and had intercourse with her.

On another occasion when her parents were at a friend's house partying, he took her from her room where she was watching TV to his bedroom, fondled her, lay down on his bed, and forced her to have sex with him. She also testified that he did not have sex with her. He heard the front door open and it was her mom. He told her to go back to her room, closed his door and "pretend [*sic*] he's sleeping, pretend [*sic*] like nothing happened."

**Count 3, Lewd Acts on a Child Aged 14 or 15, Section 288, Subdivision (c)(1), April 26, 2002**

At Victim's 15th birthday party, held in the evening at her home in San Jose, defendant came into Victim's room, locked the door, pushed her onto the bed, and

squeezed her breast under her shirt. Someone knocked on the door; defendant left the bedroom through another door that led to the backyard.

While Victim was in the eighth grade, defendant called her from work every day and talked "dirty" to her. If she did not answer, he would keep calling. Before he had come to her mom's house in August, he said; "I hope no one is home so we can have sex in the shower." The next day, he called and said, "Oh, your breasts got bigger."

Victim testified she did not yell or resist defendant because he was a lot stronger than she was and she was afraid he might hit her or doing something to her. He was 5 feet 7 inches tall and strong and she was five feet two. She had seen him hit (she also used the word "spank") his children when he was mad at them. When defendant was not molesting her, he was friendly and nice toward her. He did not discipline her. She testified she was not afraid of him when his family was around, but she was afraid of him when she was alone with him. She continued visiting defendant's house because she wanted to see her nieces and nephews and she thought defendant would stop molesting her.

In 2003, when Victim was 16 or 17 years old, about six months after her 21-year-old brother, D.'s, funeral, Victim called her brother, S., known as John, and told him what defendant had done to her. She testified she told John because she hurt whenever she thought about what happened. She also admitted she was angry with defendant and had asked him how he dared to come to D.'s funeral. She testified she did not blame him for D.'s death but she was angry for what he had done to her. (Defendant testified that she did blame him for D.'s death because defendant did not allow D. to stay in his house before he died.) She told defendant that she hated him.

John testified that Victim told him in some detail that defendant used to touch her private parts when she was sleeping and she described the incident in the van. John testified she sounded nervous, scared, and as if she were crying on the phone. John urged

her to seek counseling and file a report. John had seen Victim with defendant and his family when his mother had parties and on special occasions. John had not noticed any tension between Victim and defendant before she filed the report, but "they didn't look at each other or nothing. . . . When I saw, it looks pretty normal." Victim mostly "stay[ed] in her room, maybe talk[ed] to the kids. The kids would go into her room. . . . When they come around, she kind of stick [*sic*] around her room area, . . . and come out to get something to eat and then she would go back in." John could not really tell if she was emotional when defendant was around.

Before Victim filed a report, defendant telephoned her to say that if she told the family or his wife, he would kidnap her and take her with him. Later, Victim told a counselor at school.

San Jose Police Detective Michael Wharton interviewed Victim at school. She described having sex with defendant in the van, the bathroom, and defendant's bedroom. She described multiple incidents in the bedroom and defendant's touching of her private parts and breasts. She said defendant asked her to "jack him off" in the van.

Victim agreed to make a pretext phone call to defendant from the police department. The recording was played for the jury. Victim was crying as she talked to defendant and complained that he had sex with her in the van and in the bedroom. Defendant asked her to "just let it go" and not let "anything happen between the family." Victim asked him why he would have sex with a minor when he had a wife. Defendant said it was a mistake and he was sorry, "so just let it go." He said, "Oh, can you just let everything go, please? . . . I beg you. Okay? Can we agree? Let's do this between you and me, alright [*sic*]?" When Victim expressed outrage that she was "a little girl" when he started having sex with her, defendant responded, "[w]ell, it's just your emotions." Victim asked why defendant had sex with her when she was younger. He said, "I don't

know." He admitted what he did was wrong and he made a mistake. He apologized and said he was sorry and felt bad.

**Defense**

A.T. testified that when Victim came to visit in the summertime, seven people stayed in their two-bedroom apartment. Victim would call and ask to be picked up for a visit and they would go to San Jose "on holiday" to get her. While A.T. was there, she never noticed anything unusual between defendant and Victim. He treated her the same way he treated his own children. She saw Victim push defendant, but not pinch him. It appeared to A.T. that Victim liked spending time with her children. A.T. verified that the family had a van with a sofa bed in it and that a red bridge was about 10 minutes from their home.

Grandma testified she lived with defendant and his family in Stockton. She slept in an upstairs room with a grandson although sometimes he slept downstairs with his mother. Victim slept with "another granddaughter named [M.]" in an upstairs bedroom. Grandma never talked to Victim and was not on friendly terms with her. She watched Victim all the time when she visited. She stated, "I feel like she's a bad girl." She testified defendant liked Victim like his own daughter because she was the same age as his daughter. Sometimes Victim would follow defendant around the house and sometimes not. Grandma did not see Victim touch or push defendant, and she never saw him touch her or be alone with her. Victim was never upset or crying when she visited nor did she show a change in her emotional state. "She just follow [*sic*] all the boys."

Defendant's 17-year-old son, V.T., testified that Victim slept in the large bedroom with all the children when she came to visit, his grandma would sleep in the other bedroom, and his parents would sleep downstairs. Victim would sleep in the big bed with his sister and youngest brother, although sometimes she would sleep on the floor. The room was crowded. Sometimes when V.T. got up in the middle of the night, he

would wake up other people. When V.T. was eight or nine, he normally went to bed around midnight or 1:00 a.m. and got up at 5:30 or 6:00 a.m. to watch his "show . . . Rug rats, [*sic*] cartoons." He never saw defendant do anything sexually inappropriate to Victim and she never said she was afraid of him. He saw Victim joke with defendant, punch him, pinch him, and call him names. He never noticed a change in her behavior when she came to visit.

Defendant's 15-year-old daughter, M.T.S., also testified that Victim did not appear afraid of defendant, was always playful with him, and that she never saw defendant touch Victim in a sexual manner. M.T.S. testified Victim slept next to her in the large bedroom. Sometimes they woke up at 4:00 in the morning, but it would vary depending on how late they went to bed the night before. M.T.S. and Victim were very close, and were always together. Defendant treated Victim like his own daughter. Victim was playful with defendant and never appeared to be afraid of him. M.T.S. never saw her father and Victim together in the early morning hours, and her parents never slept in an upstairs bedroom.

Defendant presented two character witnesses, V.H., who grew up with defendant, considered him his brother, and lived near him, and R.H., defendant's second cousin. Both witnesses testified that they knew defendant well, saw him at Buddhist services and Cambodian social functions, and considered him honest.

William Van Cleave, the defense investigator, testified that he interviewed Victim twice. She told him that when defendant had sexual intercourse with her in her brother's room, he used a condom, and that when defendant made her have sexual intercourse with him, it was painful. Also, in the middle of having sex with her, defendant told her to be quiet, and she told him that she did not want him touching her or doing these things to her. She described an act of intercourse during which she told defendant it hurt and "he

said he was going to still force himself inside of her." Victim told Van Cleave that she was being blamed for breaking up the family.

Defendant testified that Victim sometimes called A.T. and asked to visit when she was alone and her parents were not home. He would take the whole family and they would go to pick her up. The first summer Victim stayed was when she was six or seven years old. She did not come every summer—defendant did not remember her being at his home in the summer of 1997 or from 2001 to 2004. When she did come, she would stay from four to six weeks. Sometimes she slept downstairs, but most of the time she slept on the floor in the big bedroom with the two big children and defendant also slept there with his wife on the bed.

Defendant treated her like one of his own children. She was friendly, respectful, and obedient. Victim was born prematurely, and defendant thought she appeared small for a nine-year-old. Defendant and his children and Victim played hide and go seek around the house and went out fishing. They did not engage in roughhousing or horseplay.

In 1999, Victim looked a little younger than her age, but otherwise normal. "She just stick [*sic*] with my daughter, playing around the computer." She was not asked to help take care of defendant's younger son. She slept both upstairs and downstairs, but always with his daughter and older son. She never slept alone with him. During that year, she also became more playful, pushing and pinching him. She pinched wherever she could reach and it hurt and made him mad. She would run and pinch him and then run back and sit on the couch. Defendant's whole family saw her. Defendant never touched her breasts or vaginal area nor did he have any sexual contact with her.

In the year 2000, Victim had started to develop breasts and she became more aggressive in pushing and pinching him. Defendant again stated he never touched her breasts or vaginal area until one morning in June 2000, when he got up about 4:20 a.m. to

go to work. His clothes were in the closet, and Victim, M.T.S., and V.T. were sleeping on the floor in front of it. Defendant could not step over them, so he tried to push Victim, who was closest to him, out of the way with his foot. She woke up and moved sideways, and defendant stepped over her and got his clothes. As he went toward the bathroom, Victim pinched his ankle. He pushed her hand away with his foot and continued into the bathroom.

He heard someone behind him and expected it to be A.T., who also got up early to go to work, but it was Victim. Somehow the door got closed, and Victim pushed him against the sink and began pinching his thigh, legs, and face. He tried to push her away but she would not stop. He put his hand on her breast and started to fondle it and she pulled her pants down. He got scared and pushed her back. She stopped pinching him but started stroking his neck, face, and head. He got even more scared and pushed her away, opened the door, and left the bathroom. He ran downstairs to the half-bath, washed his face, put his clothes on, warmed up his food, and went to work. Defendant felt bad about it but did not say anything about it to Victim.

In February 2001, when defendant was staying at Victim's parents' house on weekdays, he gave Victim a ride from San Jose to Stockton at Victim's father's request. Victim still kept pinching and pushing him when they were alone. After they drove past Tracy, Victim began pinching defendant on his face, arms and neck. He slapped her hands but she would not stop. He was swerving all over the road, so he pulled over and tried to push her off, but she would not stop. He put his hand on her breast and she stroked his face, but a sheriff's deputy drove by and defendant became scared. He started the van and drove off.

Defendant acknowledged that Victim accused him of sexual acts during the pretext call. He repeatedly testified that he did not deny her accusations on the phone because "I didn't think about that," "I couldn't think of any other answer," "I didn't think

of any other question—I mean answer," "I didn't think of that," "I didn't think of anything, specific answer," "I couldn't think of any other answer," and "I didn't think of it."

Defendant testified that Victim's brother, D., died on April 8, 2003, and that Victim told him she held him responsible for D.'s death and that she hated him. Before then, there had been no bad feelings between them.

Defendant's first day of testimony ended with admissions of only touching Victim's breast and nothing more. However, on his second day of testimony, after admitting sexual intercourse in the bathroom in June 2000, he stated he had been too ashamed and embarrassed the day before to testify to it in front of his family. He was admitting it then because it was the truth.

Defendant testified that Victim followed him into the bathroom and removed her own clothes and he put her foot on the toilet, and had sexual intercourse with her. He ejaculated in his pants and she went back to her room. Defendant testified that he believed Victim wanted to have sex with him and that she never said anything to suggest otherwise and that if she had said "no," he would not have had sex with her. He testified that she consented to the intercourse in the bathroom.

Defendant admitted that "something more" happened in the van in February 2001. They had sex. It was a high top van, so defendant could walk between the seats to the back of the van. Victim followed him. She removed her own clothes and stroked his penis. He did not ask her to and she stopped on her own. She engaged in sexual intercourse with him and she stopped and got up before he ejaculated. She never said or did anything to suggest that she did not want to have sex with him, and he did not threaten her with physical violence. He had never harmed or disciplined her in the past. Defendant said he was not sexually attracted to Victim and had never touched her breasts or vaginal area for the purpose of sexual arousal.

In the summers between 1996 and 1998, when Victim visited, defendant would play with her just like he played with his own children. He denied touching either her breasts or vaginal area to arouse himself or to arouse her.

The parties stipulated that April 26, 2002, was a Friday. Defendant testified that he was in Stockton running his car detailing business and that he did not attend Victim's 15th birthday party. On cross-examination, the prosecutor reminded defendant he testified he had an auto detailing business in 1996 and sold it in May 1998. Defendant explained that he started a second auto detailing business on May 7, 2001, and sold it in August 2002.

Defendant stated he did not decide ahead of time to have intercourse with Victim in the bathroom; it was "just emotional." The event in the van was "just emotional" also. Her pinching and stroking caused him to be sexually aroused. She was never shy with him nor did she ever cry just because he looked at her.

Defendant was convicted of the charges as stated *ante* and was sentenced to 15 years to life in state prison on count 2 with a concurrent 14-year term calculated as the midterm of 12 years on count 1 and the two-year midterm on count 3. This appeal ensued.

ISSUES ON APPEAL

Defendant contends he was denied due process and a fair trial because (1) the trial court (a) erred in responding to the jury's question about consent and counsel was ineffective for failing to request further instruction on the meaning of consent; (b) failed to define "menace" for the jury, and (c) failed to instruct that if the jury had a reasonable doubt as to whether the defendant committed the greater offense as charged or a lesser included offense, it must convict only of the lesser offense in compliance with *People v. Dewberry* (1951) 51 Cal.2d 548. (2) Defendant's due process and fair trial rights were also implicated by trial counsel's failure to timely object to the prosecutor's misconduct.

JURY INSTRUCTIONS

1. Consent

Defendant asserts that the conflicting instructions on "consent"—that it was a defense to count 2, aggravated sexual assault on a child based on forcible rape (§ 269), and that it was not a defense for counts 3 and 4, lewd and lascivious acts on a child — were prejudicially inadequate and the apparent conflict should have been explained "so that the concept that a 13-year-old child *could* consent to sexual intercourse was clear to the jury." When the jury was deliberating, it asked in regard to count 2 whether a 13-year-old can "consent."[3] Defendant claims that further explanation of the conflict was required because the concept is "counter-intuitive and was contrary to the instructions the jury received on all the other charges," namely, lewd conduct on a child. Furthermore, defense counsel should have asked for additional instructions and was ineffective in failing to do so.

The aggravated sexual assault charge in count 2 was based on the predicate offense of forcible rape. (§ 261, subd. (a)(2) (section 261(a)(2)).) Defendant admitted two acts of sexual intercourse (in the bathroom and van) but claimed that Victim consented to them, namely, that she participated voluntarily and willingly and without force, violence, duress, menace, or fear of immediate and unlawful bodily injury to herself or others within the meaning of section 261(a)(2).[4]

---

[3] The People claim this issue is waived because when defense counsel was notified by telephone, he did not object to the trial court's proposed response to the jury. However, section 1259 states the "appellate court may also review any instruction . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." Trial counsel is not precluded from raising on appeal the issue of the adequacy of a court's response to questions from a deliberating jury. (*People v. Thompkins* (1987) 195 Cal.App.3d 244, 251, fn. 4.)

[4] Section 261(a)(2) states: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: (continued)

The court instructed the jury pursuant to CALCRIM No. 1000,[5] which states, as is relevant here, that one of the elements of rape is "[t]he female did not consent to the intercourse"; that intercourse was accomplished by force and fear (see fn. 6, *post*); that "[t]o consent, a female must act freely and voluntarily and know the nature of the act"; that "defendant is not guilty of rape if he actually and reasonably believed that the female consented to the intercourse"; and that the People had the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the female consented.

As to counts 3, (lewd and lascivious acts on a child age 14 or 15 who was at least 10 years younger than defendant (§ 288, subd. (c)(1))), and 4 (lewd and lascivious acts on

---

[¶] . . . [¶] (2) Where it is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."

[5] CALCRIM No. 1000 states: "To prove that the defendant is guilty of rape, the People must prove that: [¶] One. The defendant had sexual intercourse with a female. [¶] Two. He and the female were not married to each other at the time of the intercourse. [¶] Three. The female did not consent to the intercourse. [¶] And four. The defendant accomplished the intercourse by force, violence, duress, menace or fear of immediate and unlawful bodily injury to the female or to someone else. [¶] Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis. Ejaculation is not required. [¶] To consent, a female must act freely and voluntarily and know the nature of the act. [¶] Intercourse is accomplished by force if a person uses enough physical force to overcome the female's will. [¶] Duress means a direct or implied threat of force, danger or retribution that could cause a reasonable person to do or submit to something that she would not do or submit to otherwise. [¶] When deciding whether the act was accomplished by duress, consider all of the circumstances, including the female's age and her relationship to the defendant. [¶] Intercourse is accomplished by fear if the woman is actually and reasonably afraid or she is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it. [¶] The defendant is not guilty of rape if he actually and reasonably believed that the female consented to the intercourse. The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the female consented. If the People have not met this burden, you must find the defendant not guilty."

a child under 14 years of age (*id.*, subd. (a))) the court instructed that "[i]t is not a defense that the child may have consented to the act."

Defendant argues that this was a cause of confusion as shown by the question sent out by the jury during deliberations which asked, "The law refers to a 'woman' giving consent. Can a 13 year old give consent at all by law?" The court wrote back, "Please refer to instruction #1000 on page 21. 'Consent' as there defined refers to any female."

Defendant claims the answer was prejudicially inadequate, and that the court should have said, " 'yes,' a 13-year-old can give consent." He states an explanation of the apparent conflict in instructions was needed because "[i]n the absence of a specific instruction, a reasonable juror would have concluded that the generic language in the instruction on rape, referring to a 'female' or a 'woman,' did not pertain to a 13-year-old *child.* Nothing in the instructions given to the jury made it clear that a 13-year-old *child* could consent to sexual intercourse." Defendant concludes that the court "figuratively thr[e]w up its hands and t[old] the jury it c[ould] not help." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

The People counter that the court adequately answered the jury's question "whether a 13-year-old can give consent under the law." "A 13-year-old cannot give legal consent to sexual intercourse. (Pen. Code, § 261.5 [unlawful sexual intercourse is an act of sexual intercourse with a minor; a minor is a person under 18 years of age].) . . . [The] defense was a claim of factual consent, not legal consent."

In a prosecution for rape "in which consent is at issue, 'consent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.)

"Before 1970, . . . a minor who voluntarily engaged in sexual intercourse with an adult was deemed unable to give legal consent to such an act, and actual consent was no

defense to rape or related crimes. In *People v. Verdegreen* (1895) 106 Cal. 211, for example, we [the California Supreme Court] held that actual consent was not a defense to the crime of assault with intent to commit rape. Our opinion explained: 'It is the declared policy of our law, as expressed in [section 261], that any female under the age there fixed shall be incapable of consenting to the act of sexual intercourse; and that one committing the act with a girl within that age shall be guilty of rape, notwithstanding he obtain her actual consent. . . . [In] a case where under the law there can be no consent . . . the law implies incapacity to give consent, and this implication is conclusive.' (*Id.* at pp. 214-215.)" (*People v. Tobias* (2001) 25 Cal.4th 327, 339 (*Tobias*) (conc. opn. of George, C.J.).) When the Legislature adopted the crime of unlawful sexual intercourse with a person under age 18 (§ 261.5), it " 'necessarily acknowledged the obvious truism that minor females are fully capable of freely and voluntarily consenting to sexual relations.' " (*Tobias*, *supra*, 25 Cal.4th at p. 341 (conc. opn. of George, C.J.).)

In final arguments here, both counsel discussed consent with reference to Victim's age during closing argument. The prosecutor stated, "when deciding whether the act was accomplished by duress, consider all of the circumstances, including the child's age and relationship to the defendant. [¶] The analysis is totally different when we are talking about a kid as opposed to when we are talking about adults. And I just remind you, you met [Victim] when she was 18. I'm talking about things that happened when she was 13" and she was younger, smaller, lighter, less knowledgeable, less sophisticated, and a child; and he was a man, twice her age, size, strength, and speed and in a position of trust.

Defense counsel commented that "there are 13 year olds and there are 13 year olds . . . some girls that [are] far more advanced and some that [are] far more immature. And some that seem[] to be rather sexually aggressive and some that seem[] not to have any interest in sex whatsoever." He pointed out that the jury knew nothing about how Victim behaved at 13, and then launched into consent as it could be inferred from

Victim's testimony about her behavior ("there were no threats, there was no force, . . . she didn't resist. She took off her own clothing. She put her own clothing back on. She went to the bathroom on her own volition, went to the back of the van on her own volition. . . . She stroked [defendant's] penis on her own volition. She stopped on her own volition. [¶] They engaged in intercourse without saying no").

The jury began deliberating at 4:20 p.m., sent out its first question at 4:50 p.m., asking if Victim said on the stand that she was crying in the van during sex, and the second question about consent at 4:55 p.m. The jury recessed for the weekend at 4:59 p.m., returned to deliberations at 9:00 a.m. the next court day, listened to read back in answer to its first question from 9:04 to 9:05 a.m., sent out a note asking about a discrepancy between the count 3 verdict form and the "information packet" at 9:15 a.m., and announced it reached a verdict at 10:00 a.m.

During deliberations, "if there be any disagreement between [jurors] as to the testimony, or if they desire to be informed on any point of law arising in the case, . . . the information required must be given." (§ 1138.)

In reading the instructions given here, we see that the CALCRIM No. 1000 rape instruction referred to "a" or "the female" everywhere except in the statement, "Intercourse is *accomplished by fear* if the woman is actually and reasonably afraid . . . ." (Italics original.) The trial court read the instructions verbatim to the jury before it retired, and the written instructions were available to the jurors in the jury room. CALCRIM No. 1000 is the only source for the word "woman." From the evidence of the jury's written questions to the court, it appears they gave a close reading to the documents provided by the court, quickly noting the discrepancy in the terminology used in the instructions ("female" and "woman") and the count 3 verdict form's typographical error referring to a child under 14 when the form should have conformed to the "information packet's" "child under 14 or 15."

Consequently, the jury's reference to "the law" in its question ("the law refers to a 'woman' giving consent. Can a 13 year old . . . ?") must refer only to CALCRIM No. 1000 where the word "woman" is introduced. The trial court's answer referring the jurors back to CALCRIM No. 1000 and stating that " 'Consent' . . . refers to any female" is directly on point in the tight frame of reference presented by the question.

Defendant's concern whether the court adequately explained to "the average lay-person unfamiliar with the intricacies of the law" the "counter-intuitive . . . concepts involved in the forcible rape of a child" versus the child's incapacity to give legal consent to lewd acts on a child under 14 or 14 or 15 (see counts 2 and 4), is unfounded. The jury did not express confusion about a minor's ability to give actual consent to sexual intercourse but inability to give legal consent to a differently-defined crime, lewd conduct with a child. Here, the court precisely answered the question asked related to a discrepancy in the terminology in a specific instruction on the elements of a particular crime. The court properly instructed the jury and responded precisely and completely to the question asked. There was no error. Counsel was not ineffective for failing to request further instructions on the concept of "consent."

2. Menace

Defendant also asserts that count 2 must be reversed because the trial court failed to sua sponte define the term "menace." He claims that "menace" has a particular legal meaning, which the trial court should have defined when it instructed that forcible rape is accomplished "by force, . . . [or] menace." Defendant claims that the jurors could have had different understandings of the term and quotes a number of dictionary definitions which he says offer several different meanings of the term "menace," such as " 'a person whose actions, attitudes, or ideas are considered dangerous or harmful' or 'an extremely annoying person,' common concepts made popular by the comic strip character

Dennis-the-Menace." He declares it "highly unlikely the 12 members of [defendant's] jury had the same common understanding of the definition of the term."

The rape statute defines "menace" to mean "any threat, declaration, or act which shows an intention to inflict an injury upon another." (§ 261, subd. (c).) Defendant states that common definitions include the statutory definition of the term, but also include a definition that falls short of covering what the statute requires (an "extremely annoying person" or "an impending evil"). That is precisely why the Legislature included the definition of the term menace in the statute.

"When a word or phrase ' "is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request." ' " (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*).) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning." (*Ibid.*)

A brief check of dictionaries shows that the noun "menace" is commonly defined as "a show of intention to inflict harm." (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 725; Webster's New International Dict. (2d ed. Unabridged 1957) p. 1534; Merriam-Webster's Online Dict. (http://www.m-w.com/cgi-bin/dictionary as of Jul. 26, 2007) "menace.") If the jury has to decide if an act of sexual intercourse was accomplished against a person's will "by menace," the jury is deciding whether defendant exhibited "a show of intention to inflict harm." While, as defendant says in his brief, "menace" can also mean "an impending evil" and "a troublesome or annoying person" (defendant cites the American Heritage Dict. of the English Language (4th ed. 2000)), those definitions do not fit the context. Thus, it is highly unlikely that jurors, persons who understand and speak English, would think that the question to be decided

was if defendant accomplished an act of sexual intercourse by use of "a troublesome or annoying person" or "an impending evil."

"Inasmuch as the statutory definition[] of . . . 'menace' do[es] not differ significantly from the nonlegal, common meanings of [that] word[][.] [T]he trial court had no sua sponte duty to instruct the jury on the definition[] of . . . menace." (*People v. Elam* (2001) 91 Cal.App.4th 298, 307.) There was no error.

3. "*Dewberry*" Instruction on Counts 1 and 2

Defendant next complains that the trial court failed "to instruct the jury, in accordance with *Dewberry*, that if they were convinced beyond a reasonable doubt that [defendant] committed a crime, but they had a reasonable doubt as to whether he committed the greater or lesser offense, they were *required* to convict [defendant] of only the lesser offense." Specifically, the court had a sua sponte duty to instruct that lewd and lascivious conduct (§ 288, subd. (a)) was an uncharged lesser offense of both the continuous sexual conduct charged in count 1 and the aggravated sexual assault of a child charged in count 2. Defendant claims the failure to so instruct constituted prejudicial error requiring reversal.

The trial court instructed that for count 2, aggravated sexual assault, count 4, lewd act on a child under 14, was an alternative count to count 2 and that if the jury found defendant guilty of one of the charges, it could not find him guilty of the other. (CALCRIM No. 3516.)

The court stated that count 1 charged that defendant committed continuous sexual abuse; that the People presented evidence of more than one act to prove that defendant committed this offense and that the jury could not find the defendant guilty unless all agreed that the People proved that the defendant committed at least three or more of these acts but that the jury did not need to agree on which acts he committed; and that the

offense of lewd and lascivious acts on a child under 14 is a lesser offense of continuous sexual abuse. (CALCRIM No. 1120.)

The instruction continued that the jury was given one verdict form for each offense and that it could consider these different offenses in whatever order it wished. The court stated it was going to explain how to complete the verdict forms using one order, but the jury could choose the order to use. As with all the charges in this case, to return a verdict of guilty or not guilty on an offense, the jurors must all agree on that decision. If they all agreed that the People had not proved that the defendant committed any of these offenses, then it must complete each verdict form stating that he is not guilty.

If the jurors all agreed that the People proved that the defendant was guilty of continuous sexual abuse, they were to complete the verdict form stating that the defendant was guilty of that offense. They were not to complete the other verdict form for the lesser offense. The jury could not find the defendant guilty of both continuous sexual abuse and the lesser offense of lewd and lascivious act upon a child under 14.

If the jurors all agreed that the defendant was not guilty of continuous sexual abuse, but agreed that the People proved that the defendant was guilty of lewd or lascivious act on a child under 14, it must first complete the verdict form stating that the defendant was not guilty of continuous sexual abuse then complete the verdict form stating that the defendant was guilty of lewd or lascivious act on a child under 14. The jury was instructed not to complete the verdict form stating that the defendant was guilty of lewd or lascivious act on a child under 14 unless it all agreed that the defendant was not guilty of continuous sexual abuse.

The court stated that the People had the burden of proving beyond a reasonable doubt that the defendant committed continuous sexual abuse rather than a lesser offense. If the People did not meet this burden, the jury had to find the defendant not guilty of continuous sexual abuse. (CALCRIM No. 3517.)

In addition, the court gave the reasonable doubt instruction (CALCRIM No. 220); CALCRIM No. 359, which stated, "You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt"; and CALCRIM No. 224, which stated in relevant part: "If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports the finding that he did not, you must conclude that the required intent or mental state was not proved by the circumstantial evidence."

*Dewberry*, *supra*, 51 Cal.2d 548, "was a murder case in which the trial court instructed the jury on the elements of murder and manslaughter, explained that there were two degrees of murder and that, if the jury decided defendant had committed murder but had a reasonable doubt as to the degree, 'they should give defendant the benefit of the doubt and find him guilty of second degree murder.' [Citation.] Although the *Dewberry* jury also was instructed that if it had a reasonable doubt whether the killing was manslaughter or justifiable homicide, it was to acquit, the trial court refused a *general* defense instruction that would have told the jury that if it found the defendant ' "was guilty of an offense included within the charge . . . , but entertain a reasonable doubt as to the degree of the crime of which he is guilty, it is your duty to convict him only of the lesser offense." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1262 (*Musselwhite*).)

Our Supreme Court reversed Dewberry's conviction of second degree murder because "a criminal defendant is entitled to the benefit of a jury's reasonable doubt with respect to *all* crimes with lesser degrees or related or included offenses. [Citation.] The 'failure of the trial court to instruct on the effect of a reasonable doubt as between any of the included offenses, when it had instructed as to the effect of such doubt as between the two highest offenses, and as between the lowest offense and justifiable homicide, left the instructions with the clearly erroneous implication that the rule requiring a finding of

guilty of the lesser offense applied only as between first and second degree and murder.' " (*Musselwhite*, *supra*, 17 Cal.4th at p. 1262.)

The jury was also instructed that where it could draw two opposing reasonable inferences regarding the defendant's required intent or mental state, it "must conclude that the required intent or mental state was *not* proved by the evidence." (CALCRIM No. 224.) (Italics added.)

Musselwhite's "case [was] different," (*Musselwhite*, *supra*, 17 Cal.4th at p. 1262) which we also conclude about the case here. In *Musselwhite*, "the trial court *did* give the jury several generally applicable instructions governing its use of the reasonable doubt standard. All redounded to defendant's benefit in the sense that each required the jury, where it had a reasonable doubt as to *any included or related offenses or degrees*, to find defendant guilty of the lesser included or related offense or lesser degree, that is, to give defendant the benefit of any reasonable doubts it may have had." (*Ibid.*)

Defendant's suggestion in his brief that the court should have given something like "if the jury has determined that the defendant is guilty of a crime, but cannot determine whether to convict on the greater or the lesser offense, [it] *must* convict *only* of the *lesser* offense," was unnecessary in our case. The trial court clearly instructed that as to the alternative counts (counts 2 and 4) and the greater and lesser offenses (count 1), the jury could not convict defendant of both counts. Most importantly, the court made clear that the People had the burden of proving all the elements of the crime beyond a reasonable doubt (CALCRIM Nos. 220, 1123, 1000) and if the People had not proven each element of each crime to the level of proof, the jury was to return a not guilty verdict.

As for count 1, continuous sexual abuse of a child, unlike the murder charge in *Dewberry*, the jury did not have an array of lesser offenses to consider (in *Dewberry*, two degrees of murder, manslaughter, and justifiable homicide). The jury had only one lesser included offense to count 1 and, for that matter, one alternative charge (count 4) for the

conduct alleged in count 2. The jury could consider the different offenses in any order it wished, but, as with all the charges in this case, to return a verdict of guilty or not guilty on an offense, all jurors had to agree on that decision.

Unlike Dewberry's jury, defendant's jury was not instructed on the effect of reasonable doubt on some offenses and not on others; it was instructed that *each* element of *each* crime had to be proven beyond a reasonable doubt and that if the jury did not agree, it had to complete the "not guilty" form. This instruction addresses "the question of how to choose between the greater and lesser offense." For example, the jury could not, as defendant feared, find him guilty of aggravated sexual assault even if it found that he had only accomplished consensual sexual intercourse with Victim. Under the instructions as given, if the jury did not find forcible rape, an element of aggravated sexual assault, it had to find defendant not guilty of aggravated sexual assault although it still had the duty to consider the alternative whether defendant was guilty of lewd acts on a child under 14. Similarly, if the jury could not agree, for example, that defendant committed three or more lewd acts with Victim as charged in count 1, then it had to find defendant not guilty of continuous sexual abuse but still had to decide if defendant was guilty of committing a lewd act on a child under 14 pursuant to section 288, subdivision (a). The instructions as given took the jury to the same analytical place that defendant wants to take them with his suggested instruction. The CALCRIM instructions were adequate; there was no instructional error.

ACQUITTAL ON COUNT 4

Next, defendant asserts that the judgment should be modified to reflect an acquittal on count 4 if this court does not reverse count 2. This court did not reverse count 2, and will not modify the judgment as requested because the jury did not acquit defendant of lewd and lascivious conduct on a child under 14 in count 4. The jury followed the trial court's instruction that if it convicted defendant of continuous sexual

abuse, it should complete the verdict form showing that defendant was guilty of that offense, but that it should not complete any verdict form for the lesser offense because "[y]ou cannot find the defendant guilty of both continuous sexual abuse and the lesser offense of lewd and lascivious act on a child under 14."

Once the jury convicted defendant of count 2, it did not consider count 4. The conviction on the greater charge did not imply an acquittal on the lesser charge. As the People put it, "[o]n the contrary, the conviction of the greater charge implies a conviction of the lesser charge as well, but under the law a defendant cannot be convicted of both a greater offense and a necessarily included lesser offense. (*People v. Pearson* (1986) 42 Cal.3d 351, 355.)"

PROSECUTORIAL MISCONDUCT

Finally, defendant contends that he was denied due process and a fair trial because trial counsel failed to timely object to the prosecutor's "misstating the law and erroneously arguing that it was *impossible* for [Victim] to consent to sexual intercourse with [defendant], in connection with the charge of aggravated sexual assault of a child." The prosecutor also elicited inadmissible evidence from Detective Michael Wharton that caused him to vouch for the truthfulness and persistence of people who are willing to make pretext telephone calls.

The prosecutor's offending words came in rebuttal argument in response to defense counsel's argument that there was no physical evidence of force like bleeding or semen stains; that Victim testified that there were no threats, force by defendant or resistance on her part; that she cooperated in both incidents of sexual intercourse; that there was no past behavior to suggest that she was in danger in any way and that she was not afraid of defendant; and that there was intercourse "without saying no." Counsel stated defendant did not know that Victim did not consent and that the Victim did not let defendant know that she did not consent. She asked to go to defendant's house and when

she was in the same room with defendant, there was nothing to suggest to her relatives that she was afraid of defendant.

The portion of the argument appellate counsel cites is: "Now [defense counsel] also says [that] [Victim] did not let the defendant know that she did not consent. First of all, she doesn't have to let him know. She has to be—she doesn't have to tell him outwardly. He can read the signs of her. And what's the first obvious sign. She is 13. She can't consent legally. I mean, how could she consent? That's impossible. So let's just start with that."[6]

---

[6] To place the prosecutor's statement in context, the quoted portion occurred early in the prosecutor's rebuttal argument in response to defense counsel's attack that the prosecutor "left out that section about consent" when he discussed the rape charge in his opening argument. Defense counsel argued that Victim consented or did not communicate nonconsent. The prosecutor responded, "I'm going to read it [the consent section] to you and I'm going to tell you why. The defendant is not guilty of rape if he actually and reasonably believed that the woman consented to the intercourse. [¶] People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman consented. And it says prior to that, consent means a woman acts freely and voluntarily knowing the nature of the act. Now [Victim] has never, ever said she consented to sexual intercourse with him. That has never come out of her mouth. The only way you get to that conclusion, the only way you get to that paragraph, is if you believe him."

The prosecutor suggested that defendant's motive for admitting the sexual intercourse but claiming consent on the second day was to persuade the jury to convict him of the lesser offense rather than the greater. "[T]hat's the reason I didn't bring [consent] up, and if you read [the instruction] it says in order to be not guilty, the defendant has to honestly and reasonably believe that the young child was consenting to the sexual intercourse. And under his version, you have to ask yourself what in the world made you think that? Under his version, this is a 13-year-old niece [*sic*, sister-in-law] of his who has prior to that bathroom episode never done anything strange, has never been [in] any sexual interaction between the two of them, and for the first time because she is behind him in the bathroom, he all of a sudden thinks she wants to have sex with him. [¶] What I don't understand [is], how you reasonably could get to that conclusion based on the facts he is talking about . . . . [¶] Now [defense counsel] also says [Victim] did not let the defendant know that she did not consent. First of all, she doesn't have to let him know. She . . . doesn't have to tell him outwardly. He can read the signs of her. And (continued)

Defendant argues, "[b]y telling the jury that it was legally impossible for 13-year-old [Victim] to consent, it followed, ipso facto, that the government either did not have to prove lack of consent or they proved it simply by establishing the uncontroverted fact that [Victim] was 13 years old at the time of the alleged acts. This is akin to unconstitutional presumption. The prosecutor's erroneous argument effectively withdrew a critical element from the jury's consideration in violation of [defendant's] rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. [¶] The Due Process Clause of the Fourteenth Amendment requires the prosecution to bear the burden of proving beyond a reasonable doubt every essential element of a crime. (*In re Winship* (1970) 397 U.S. 358.)"

---

what's the first obvious sign? She is 13. She can't consent legally. I mean, how could she consent? That's impossible. So let's just start with that. Point two. He ignores she was crying during the act of sexual intercourse in the van. Tears were coming down her eyes. [¶] [Defense objection overruled.] [¶] [THE PROSECUTOR]: She told you, or according to my notes, she tried to. I asked the police officer about this statement what happened in the middle of the van sexual episode and how she said she tried to push him off on his chest but couldn't stop him. That's how she is letting him know. [¶] What is reasonable for her to think? She is alone with him on the side of the road with no one around. All of these things are what should be considered in the analysis of whether or not it is reasonable for him to think there is consent going on. [¶] . . . [¶] He says that their interaction was darn friendly . . . . Not exactly. Do you recall John's testimony? Whenever he came around, she avoided him. She stayed in her room, only came out to get something to eat. She had nothing to do with him at those events. Her testimony and that of his children was that . . . she didn't like [to] come out there to visit the cousins and spend time with them. And I don't think there was anything friendly about how she acted on the witness stand with those tears because of the way he was looking at her. [¶] He pointed out to you there was no direct threat. Of course not. Of course there was no direct threat. There doesn't have to be. My point in all those little things, if you go look at the law, as I know you will, there doesn't have to be. . . . We are over here in talking about implied actions that are based on who the parties are, based on their relationship, their physical size, their location, all of those factors."

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' " (*People v. Hill* (1998) 17 Cal.4th 800, 829.) Consent is an issue in a prosecution for rape and the government must prove the victim's nonconsent beyond a reasonable doubt along with all other elements of the corpus delicti. (*People v. Key* (1984) 153 Cal.App.3d 888, 895.) Lack of consent must be proved beyond a reasonable doubt even when the victim is a child. (*People v. Young* (1987) 190 Cal.App.3d 248, 257.)

The prosecutor's argument, taken in context, does not withdraw a critical element from the jury's consideration or render the trial unfair. The argument presented by both sides was focused on whether Victim's conduct manifested a lack of actual consent to the act of sexual intercourse. There was no issue whether Victim gave legal consent, and except for the prosecutor's brief interjection that Victim could not consent legally, the thrust of the parties' arguments was whether Victim did or did not manifest a lack of consent. There was no prosecutorial misconduct.

Defendant's second complaint, that the prosecutor elicited inadmissible opinion testimony from Wharton that vouched for Victim's credibility, was based on the italicized portion of the following direct examination of Wharton:

"Q: Did you tell her before she got to the police department . . . what was going to happen there? [¶] A: Well, I explained to her . . . that I would like her to do the pretext call if she was willing. [¶] Q: Did you tell her why? [¶] A: Yes. [¶] Q: What did you say? [¶] A: I told her that in cases like this it's often a very good tool and that suspects will often say things that will incriminate them when they don't know the call is being recorded and that the police are listening or involved. [¶] Q: *Did you mention anything to her about the idea of the truth*? [¶] A: *I commonly tell the victims in my cases that the truth usually comes out during the pretext call because the suspect is unaware of what's*

*going on.* [¶] Q: *Why?* . . . [¶] A: *Well, my training and experience has showed me that the victims that are willing to do the pretext call are often those that are most likely to see the prosecution all the way through to the end phase, and also it's kind of—sometimes it can determine whether the victim is being deceptive or truthful with me.* [¶] Q: *Did you mean by their readily* [*sic*] *and willingness to engage in that pretext call?* [¶] A: *Yes.* [¶] Q: *What was* [*Victim's*] *response?* [¶] A: [*Victim*] *was willing to do it without hesitation.*"

It is misconduct for a prosecutor to intentionally elicit inadmissible testimony (*People v. Chatman* (2006) 38 Cal.4th 344, 379-380) and the prosecutor has a duty to see that his or her witness " 'volunteers no statement that would be inadmissible and especially [be] careful to guard against statements that would also be prejudicial.' " (*People v. Schiers* (1971) 19 Cal.App.3d 102, 113.) An officer's opinion of the veracity of a witness is inadmissible. (*People v. Sergill* (1982) 138 Cal.App.3d 34 (*Sergill*).) In *Sergill*, two police officers were allowed to testify that in their opinion, the eight-year-old oral copulation victim was telling the truth when she reported that her uncle had sexually molested her. (*Id.* at pp. 37-38.) The reviewing court held that the opinion as to whether the witness was telling the truth was not admissible as testimony of the witness's character for honesty or veracity (Evid. Code, § 780, subd. (e)), nor as expert opinion testimony since the veracity of those who report crimes to the police is not a matter sufficiently beyond common experience to require the testimony of an expert. (*Id.*, § 801, subd. (a); *Sergill*, *supra*, 138 Cal.App.3d at pp. 39-40.) Wharton's opinion as to the veracity of those who report crimes was not admissible as the opinion testimony of a lay witness (Evid. Code, § 800), and it was irrelevant as not having a tendency in reason to prove or disprove a disputed fact that is of consequence to the action, namely, Victim's credibility. (*Id.*, §§ 210, 780; *Sergill*, *supra*, 138 Cal.App.3d at p. 40.)

"As we have stated, these officers neither knew the child, nor knew her reputation for truthfulness. [Citation.] Instead, their conclusions that she was telling the truth were based on their own self-proclaimed expertise in assessing victim veracity, but the record is devoid of any evidence to establish their qualifications in this regard. We conclude that the officers' opinions on the child's truthfulness during their limited contacts with her did not have a *reasonable* tendency to prove or disprove her credibility and were therefore not relevant." (*Sergill*, *supra*, 138 Cal.App.3d at p. 40.)

Defendant states that "[t]he obvious inference . . . from Wharton's testimony is that because [Victim] readily agreed to place the call, it therefore follows that she is honest and truthful." Defense counsel did not object to this line or questioning or request the answers to be stricken and the jury admonished. Defendant claims that this constituted ineffective assistance of counsel.

The People answer that the *prosecutor* did not vouch for Victim by questioning Wharton as he did because he was not invoking his personal prestige, reputation, or depth of experience to bolster her credibility. Wharton's testimony of Victim's willingness to make the call "was relevant to [Victim's] credibility[] in the same way that a victim's *unwillingness* to participate in a pretext call, after being told that the truth will come out, would have been relevant to the defense case."

Wharton's quoted testimony was inadmissible. His "training and experience" on whether "victims that are willing to do the pretext call . . . can determine whether the victim is being deceptive or truthful with me" is inadmissible and irrelevant as stated above. (*Sergill*, *supra*, 138 Cal.App.3d at pp. 39-40.) Wharton was not an expert witness on whether "the truth usually comes out during the pretext call because the suspect is unaware of what's going on." First, he might believe and hope that the suspect is unaware of what was going on, but he had no personal knowledge of the suspect's state of mind and could not testify to it. Second, he might believe and hope that the statements

made on the tape by the victim and the suspect would be the "truth," but it is the fact finder, not the witnesses, who must draw the ultimate inferences from the evidence. (*People v. Melton* (1988) 44 Cal.3d 713, 714.)

Furthermore, Wharton's belief that "sometimes" a victim's readiness and willingness to make a pretext call "can determine whether the victim is being deceptive or truthful with me" was improper subject matter for an expert opinion because not based on a subject that is sufficiently beyond common experience that it would assist the trier of fact, and not based on matter that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates. (Evid. Code, § 801.)

To prevail on a claim of ineffective assistance, a defendant must show not only (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, but also (2) that, as a result, the defendant was prejudiced, i.e., there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. (*People v. Benavides* (2005) 35 Cal.4th 69, 92-93.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

In this case, defendant cannot show prejudice. There is no reasonable probability that if counsel had objected to this line of questioning and the jury was admonished, that the outcome would have been more favorable to defendant. The evidence that Victim did not actually consent to sexual intercourse was strong, if believed. Although she did not say "no" on every occasion, she cried, she pushed defendant away, she avoided him, and on one occasion, she told defendant it hurt and "he said he was going to still force himself inside of her." The parties thoroughly argued the issues of consent and Victim's credibility. Defendant's credibility was significantly damaged by his admissions of lying

during the first day of testifying. The jury observed the demeanor of all the witnesses while they testified. It was not reasonably likely that the jury would have acquitted defendant of count 2 if Wharton had not testified to his belief about the truth-extracting capabilities of pretext calls and this Victim's unhesitating cooperation.

DISPOSITION

The judgment is affirmed.

Premo, J.

WE CONCUR:

Rushing, P.J.

Elia, J.

People v. Thaing
H030143

EXHIBIT "G"

THE COURT: Mr. Thaing, please step up onto the witness stand to be sworn.

YA THAING,

the defendant, called as a witness on his own behalf, being first duly sworn, was examined and testified as follows:

THE COURT: Would you please state your name and spell it for the record.

THE WITNESS: My name is Ya Thaing. Y-A. T-H-A-I-N-G.

DIRECT EXAMINATION

Q. MR. GILLAN: Good afternoon, Mr. Thaing.
A. Good afternoon.
Q. Is English your first language?
A. No.
Q. What is your -- what language did you grow up with?
A. I grew up with the Cambodian language.
Q. Were you born in the United States?
A. No.
Q. When did you move to the United States?
A. When do I come to the United States?
Q. Yes?
A. On December 14, 1981.
Q. And when did you begin speaking English?
A. I went to high school in 1982. Then I graduated from high school 1986.
Q. Before this case where you were charged with the crimes in this case, were you employed?
A. Yes.

Q. Did you have sexual intercourse with her?
A. Yes.
Q. Did you ejaculate inside of her?
A. No.
Q. Do you know where did you ejaculate or -- strike that. Did you ejaculate?
A. Yes.
Q. Do you know where you ejaculated?
A. Inside my pants.
Q. What happened after you ejaculated?
A. I put my pants on. I got out. I went downstairs.
Q. What did Tara do?
A. She went back straight to the room and go back to sleep.
Q. Did you say anything to Tara in order to get her to go to the bathroom?
A. No.
Q. Did you believe that she wanted to have sex with you in the bathroom?
A. Yes.
Q. Did she ever say anything to you to suggest that she didn't want to have sex with you?
A. No.
Q. Did she ever do anything with her body or her hands to suggest that she didn't want to have sex with you?
A. No.
Q. If she would have said no, what would have happened?
A. It would not happen.

Q. Were you holding her in any way?
A. No.
Q. When she was stroking your penis, was she fully clothed or had she removed her clothing?
A. She removed her clothing.
Q. Did you have sexual intercourse in the back of the van?
A. Yes.
Q. Did you ejaculate inside of her?
A. No.
Q. Do you know where you ejaculated?
A. She stopped before I become ejaculated.
Q. What do you mean she stopped before you became ejaculated?
A. She got up before, you know, I become ejaculated.
Q. So the sex ended before you ejaculated?
A. Yes.
Q. Did Tara ever say anything to you to suggest that she did not want to have sex with you?
A. No.
Q. Did she ever do anything with her hands or her body to suggest that she did not want to have sex with you?
A. No.

MR. BRAKER: Your Honor, I'm going to object to the form of that question. I think it calls for speculation.

THE COURT: Overruled on speculation grounds.

Q. MR. GILLAN: You can answer. Do you remember the

question?

A. No.

Q. Did she do anything with her hands to push you away?

A. No, she did not.

Q. Did she do anything else to suggest to you that she didn't want to have sex with you?

A. No.

Q. Did she do anything to suggest that she was not consenting to the intercourse?

MR. BRAKER: Objection, it calls for speculation.

THE COURT: Overruled on that grounds.

THE WITNESS: No, she did not.

Q. MR. GILLAN: Did you threaten her with any physical violence?

A. No.

Q. Did you ever raise a hand to her like you might harm her?

A. No.

Q. Had you ever touched -- harmed her in the past?

A. No.

Q. Had you ever disciplined her?

A. No.

Q. Now between 1996 and 1998 when Tara visited you during the summers, did you play with her?

A. Yes, I did.

Q. And how would you play with her?

A. I play with her just like I play with my own children.

Q. When you played with her during the summer visits, did

you do anything because you were sexually attracted to her?

A. No, I'm not sexually attracted to her.

Q. In 19 -- I'm talking just about 1996 to 1998.

A. Yes.

Q. Between 1996 and 1998, did you do anything with Tara that -- and played with her that you didn't do with your other children?

A. No.

Q. Did you ever touch her breasts to arouse yourself?

A. No.

Q. Did you ever touch her breasts to arouse her?

A. No.

Q. Did you ever touch her vaginal area to arouse you?

A. No.

Q. Did you ever touch her vaginal area to arouse yourself? I'm sorry. To arouse her?

A. No.

Q. Now on April 26 of 2002 --

MR. GILLAN: Your Honor, can we approach briefly?

THE COURT: Sure.

(Pause in proceedings.)

(A sidebar conference was held, not reported.)

MR. GILLAN: Your Honor, I think the DA and I have agreed on a stipulation that April 26 of 2002 was a Friday.

THE COURT: Is that the stipulation, counsel?

MR. BRAKER: Yes.

THE COURT: Very well.

Then, ladies and gentlemen, as I indicated early

on during this process, when the attorneys stipulate or agree to any fact, you must accept that fact as being proved.

Please proceed.

Q. MR. GILLAN: Mr. Thaing, on Friday, April 26 of 2002, what were you doing?

A. I was in Stockton running my business.

Q. And what business was that?

A. It's car detailing.

Q. Did you attend Tara's 15th birthday on April 26 of 2002?

A. No, I did not.

Q. Finally, you said that Tara consented to the intercourse in the bathroom?

A. Yes.

Q. Is she responsible for the intercourse in the bathroom?

MR. BRAKER: Objection, the question is irrelevant.

THE COURT: Sustained.

MR. GILLAN: That's all I have.

THE COURT: Thank you very much, counsel.

Cross examination.

MR. BRAKER: Thank you.

CROSS EXAMINATION

Q. MR. BRAKER: Now you were up on the witness stand most of the afternoon, right?

A. Yes.

E X H I B I T   " H "

A. I had difficulty communicating with her at times. It may have been partially due to language skills. But, yeah, there some confusion between the questions I was asking and the answers she was giving me.

Q. After the meeting at the school, did you meet with her again?

A. Yes, I did.

Q. Where?

A. She came to the San Jose Police Department.

Q. For what purpose?

A. We were to try the pretext phone call to the suspect.

Q. When she got down to the police department, is there some routine conversation you have with her before engaging in the actual call?

A. Yes. I usually sit the victims down, try and put them at ease a little bit, explain what we are going to do and usually trying to give them some strategies and phrases that are helpful in the pretext call. I just do my best to prepare them.

Q. When you talk about the strategy, do you have a regular thing that you say to them?

A. I usually have them open with the suspect in a, you know, just sort of a regular greeting and then slowly work into discussing the actual incident or the crime that I'm investigating.

Q. Did you tell her before she got to the police department that there was going to be -- what was going to happen there?

A. Well, I explained to her at the end of the meeting at our school that I would like her to do the pretext call if she was willing.

Q. Did you tell her why?

A. Yes.

Q. What did you say?

A. I told her that in cases like this it's often a very good tool and that suspects will often say things that will incriminate them when they don't know the call is being recorded and that the police are listening or involved.

Q. Did you mention anything to her about the idea of the truth?

A. I commonly tell the victims in my cases that the truth usually comes out during the pretext call because the suspect is unaware of what's going on.

Q. Why? And why did you do that?

A. Well, my training and experience has showed me that the victims that are willing to do the pretext call are often those that are most likely to see the prosecution all the way through to the end phase, and also it's kind of -- sometimes it can determine whether the victim is being deceptive or truthful with me.

Q. Did you mean by their readily and willingness to engage in that pretext call?

A. Yes.

Q. What was Tara's response?

A. Tara was willing to do it without hesitation.

Q. So she came down to the police department. And did

E X H I B I T  "  I "

It is not a defense that the child may have consented to the act.

**1190.**

Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone.

**3500.**

The defendant is charged with Aggravated Sexual Assault of a Child in Count Two sometime during the period of September 1, 1998, to April 25, 2001.

The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed.

**3515.**

Each of the counts charged in this case is a separate crime, except for Counts Two and Four, which are charged as alternative offenses. You must consider each count separately and return a separate verdict for each one except for Count One, which has a lesser included offense and will be addressed in other instructions.

**3516**

The defendant is charged in Count Two with Aggravated Sexual Assault of Child and in Count Four with Lewd and Lascivious Conduct: Child Under 14. These are alternative charges. If you find the defendant guilty of one of these charges, you must find him not guilty of the other. You cannot find the defendant guilty of both.

**3517.**

Count One charges that the defendant committed Continuous Sexual Abuse.

The offense of Lewd or Lascivious Act: Child Under 14 is a lesser offense of Continuous Sexual Abuse.

You have been given one verdict form for each offense.

You may consider these different offenses in whatever order you wish. I am going to explain how to complete the verdict forms using one order, but you may choose the order to use. As with all the charges in this case, to return a verdict of guilty or not guilty on an offense, you must all agree on that decision.

If you all agree that the People have not proved that the defendant committed any of these offenses, then you must complete each verdict form stating that he is not guilty.

If you all agree that the People have proved that the defendant is guilty of Continuous Sexual Abuse, complete the verdict form stating that the defendant is guilty of that offense. Do not complete the other verdict form for the lesser offense. You cannot find the defendant guilty of both Continuous Sexual Abuse and the lesser offense of Lewd or Lascivious Act: Child Under 14.

If you all agree that the defendant is not guilty of Continuous Sexual Abuse, but you agree that the People have proved that the defendant is guilty of Lewd or Lascivious Act: Child Under 14, you must do two things. First, complete the verdict form stating that the defendant is not guilty of Continuous Sexual Abuse. Then, complete the verdict form stating that the defendant is guilty of Lewd or Lascivious Act: Child Under 14. Do not complete the verdict form stating that the defendant is guilty of Lewd or Lascivious Act: Child Under 14 unless you all agree that the defendant is not guilty of Continuous Sexual Abuse.

The People have the burden of proving beyond a reasonable doubt that the defendant committed Continuous Sexual Abuse rather than a lesser offense. If the People have not met this burden, you must find the

→

defendant not guilty of Continuous Sexual Abuse.]

**3550.**

When you go to the jury room, the first thing you should do is choose a foreperson. The foreperson should see to it that your discussions are carried on in an organized way and that everyone has a fair chance to be heard.

It is your duty to talk with one another and to deliberate in the jury room. You should try to agree on a verdict if you can. Each of you must decide the case for yourself, but only after you have discussed the evidence with the other jurors. Do not hesitate to change your mind if you become convinced that you are wrong. But do not change your mind just because other jurors disagree with you.

Keep an open mind and openly exchange your thoughts and ideas about this case. Stating your opinions too strongly at the beginning or immediately announcing how you plan to vote may interfere with an open discussion. Please treat one another courteously. Your role is to be an impartial judge of the facts, not to act as an advocate for one side or the other.
As I told you at the beginning of the trial, do not talk about the case or about any of the people or any subject involved in it with anyone, including, but not limited to, your spouse or other family, or friends, spiritual leaders or advisors, or therapists. You must discuss the case only in the jury room and only when all jurors are present. Do not discuss your deliberations with anyone.

During the trial, several items were received into evidence as exhibits. You may examine whatever exhibits you think will help you in your deliberations. These exhibits will be sent into the jury room with you when you begin to deliberate.

If you need to communicate with me while you are deliberating, send a note through the bailiff, signed by the foreperson or by one or more members of the jury. To have a complete record of this trial, it is important that you not communicate with me except by a written note. If you have questions, I will talk with the attorneys before I answer so it may take some time. You should continue your deliberations while you wait for my answer. I will

# VERIFICATION

STATE OF CALIFORNIA
COUNTY OF KINGS.

(C.C.P. SEC. 446 & 2015.5; 28 U.S.C. 1746)

I, Ya Thaing, DECLARE UNDER PENALTY OF PERJURY THAT: I AM THE Petitioner IN THE ABOVE ENTITLED ACTION. I HAVE READ THE FOREGOING DOCUMENTS AND KNOW THE CONTENTS THEREOF AND THE SAME IS TRUE OF MY OWN KNOWLEDGE, EXCEPT AS TO MATTERS STATED THEREIN UPON INFORMATION, AND BELIEF, AND AS TO THOSE MATTERS, I BELIEVE THEM TO BE TRUE.

EXECUTED THIS 29th DAY OF June 2008, AT Corcoran, CA. 93212.

(SIGNATURE) [signature]
(DECLARANT/PRISONER)

## PROOF OF SERVICE BY MAIL

(C.C.P. SEC. 1013 (a) & 2015.5; 28 U.S.C. SEC. 1746)

I Ya Thaing, AM A RESIDENT OF Corcoran State Prison, Kings County in the - STATE OF CALIFORNIA, I AM OVER THE AGE OF EIGHTEEN (18) YEARS OF AGE AND AM / A PARTY OF THE ABOVE INTITLED ACTION. MY ADDRESS IS P.O. Box 3471, Corcoran, CA 93212-3471.

ON June 29th 2008, IS SERVED THE FOREGOING DOCUMENTS,

28 U.S.C. § 2254 Habeas Corpus petition with Exhibits, A to I.

(SET FORTH EXACT TITLE OF DOCUMENTS SERVED)

ON THE PARTY(S) HEREIN BY PLACING A TRUE COPY(S) THEREOF, ENCLOSED IN A SEALED ENVELOPE(S), WITH POSTAGE THEREON FULLY PAID, IN THE UNITED STATES MAIL, IN A DEPOSIT BOX SO PROVIDED AT

Original + (1) to:

United States District Court.
Northern District of CA.
Office of the Clerk.
450 Golden Gate Ave/Box 36060.
San Francisco, CA. 94102.

Copy to:

Attorney General of the
State of California.
1300 I St./P.O. Box 944255
Sacramento, CA. 94244-2550.

THERE IS DELIVERY SERVICE BY UNITED STATES MAIL AT THE PLACE SO ADDRESSED, AND THERE IS REGULAR COMMUNICATION BY MAIL BETWEEN THE PLACE OF MAILING AND THE PLACE SO ADDRESSED, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

DATE: June 29th, 2008.

[signature]
(DECLARANT/PRISONER)
Ya Thaing.

LEGAL MAIL

06-29-08



PRIORITY MAIL
UNITED STATES POSTAL SERVICE
www.usps.com
RECEIVED
LEGAL MAIL