1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

YA THAING,                                          No. C 08-3309 WHA (PR)

                    Petitioner,              **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

        v.

DERRAL G. ADAMS, Warden,

                    Respondent.

_____/

**INTRODUCTION**

        This is a federal habeas corpus action filed by a state prisoner pursuant to 28 U.S.C. 2254. Respondent was ordered to show cause why the writ should not be granted based on the claims set forth in the petition.  Respondent has filed an answer and a memorandum of points and authorities in support of it.  Petitioner has responded with a traverse.  For the reasons set forth below, the petition is **DENIED**.

**STATEMENT**

        In 2006, a Santa Clara County jury found petitioner guilty of continuous sexual abuse of a child under 14, aggravated sexual assault of a child under 14, and committing lewd acts on a child aged 14 or 15 (Exh. 1 at 1).  On April 20th, 2006, the trial court sentenced him to a term of fifteen years to life plus two years in state prison, with a concurrent term of fourteen years (*id*. at 12).  The California Court of Appeal for the Sixth District affirmed the ruling (*id*. at 32).  The California Supreme Court denied his petition for review (Exh. 2).

1    The following background facts describing the charges are taken from the opinion of the

2    California Court of Appeal (Exh. 1 at 1–12).

3    **A.    COUNT 1 – CONTINUOUS SEXUAL ABUSE OF A CHILD UNDER 14**

4        Petitioner was married to the victim's adopted sister, A.T..  In 1996, when the victim was

5    nine years old, A.T., petitioner, their four children and petitioner's aunt, who was called "Grandma,"

6    lived in a two-story, two-bedroom house in Stockton, California.  Each summer from the time the

7    victim was nine until she was either fifteen or sixteen, she spent between two weeks to a month

8    staying at A.T.'s house with her family.

9        The victim, who was eighteen years old and living with her parents in San Jose at the time of

10   trial, testified that when she stayed at petitioner's house, he would approach her in her sleep in the

11   early morning on his way to work five days per week and fondle her breasts.  If she turned away, he

12   would continue touching her.  He would also touch the victim's breasts over her clothes while she

13   was watching television when other family members were not around.

14   **B.    COUNT 2 – AGGRAVATED SEXUAL ASSAULT OF A CHILD UNDER 14**

15       When the victim was 11, 12, and 13 years old, she slept in A.T.'s and bedroom on a sheet on

16   the floor next to the bed of the youngest son.  A.T. worked at night.  One night when everyone else

17   was sleeping and A.T. was at work, petitioner touched the victim's breasts and took hold of her

18   wrist.  She got up and petitioner led her to the bathroom, locked the door, and turned on the water.

19   He had her undress, and he penetrated her vagina with his penis.  The victim was scared and did not

20   yell or try to stop him because the Grandma was sleeping in the bedroom next to the bathroom and

21   the victim was afraid that she might mistakenly believe that the victim was "doing something to him,

22   too."

23       The victim also remembered having sex with petitioner in his bedroom "more than two times

24   . . . whenever the wife is at work, . . . I would sleep with the youngest son upstairs."  Petitioner

25   would touch her breast, pull her by the hand, and she would lie down on the bed with him and he

26   would lie next to her.  She "wasn't afraid of him but when it happened, like what he had done, when

27   it happened I'm afraid of him."  She did not tell her sister what he had done while she was staying at

28

2

United States District Court
For the Northern District of California

the house because the victim was afraid her sister would think she was lying.

When the victim was 13 years old, she went to petitioner's house in Stockton during Christmas break.  At that time, petitioner was working as a security guard in San Jose during the week and staying at the victim's parents' house.  The victim rode with petitioner to Stockton in his van because her mother, who did not know what petitioner had done, told her to go.  On the way, petitioner pulled off the road out of sight and touched her breast and took her into the back of the van where he had intercourse with her.  She was afraid he would hit her if she resisted because he was so big, and because there was no one around.  At one point, she tried to push him away, but "he forced himself back."  The victim was "tearing" but not crying.  She did not tell A.T. what happened because she did not think A.T. would believe her.

There were also incidents in the victim's home in San Jose while petitioner was staying there in her brother's room.  On two occasions when the victim's parents were out, petitioner came into her room while she was sleeping, locked the door and had intercourse with her.

**C.    COUNT 3 – COMMITTING LEWD ACTS ON A CHILD AGED 14 OR 15**

At the victim's 15th birthday party at her home in San Jose, petitioner came into her room, locked the door, pushed her onto the bed, and touched her breast.  He stopped when someone knocked on the door, and left through another door that led to the backyard.  While the victim was in the eighth grade, petitioner called her from work every day and talked "dirty" to her.  If she did not answer, he would keep calling.

The victim testified she did not yell at or resist petitioner because he was a lot stronger than she was and she was afraid he might hit her or doing something to her.  He was five feet seven inches tall and strong, and she was five feet two inches tall.  She had seen him hit or "spank" his children when he was angry.  She testified that she was not afraid of him when his family was around, but she was afraid of him when she was alone with him.

In 2003, when the victim was 16 or 17 years old, about six months after her brother's funeral, the victim called her other brother, John, and told him what petitioner had done to her.  John testified that the victim told him in some detail that petitioner used to touch her private parts when she was

**United States District Court**
For the Northern District of California

1  sleeping and she described the incident in the van.  John testified she sounded nervous, scared, and

2  as if she were crying on the phone, and he urged her to seek counseling and file a report.  John had

3  not noticed any tension between the victim and petitioner before she filed the report.  Petitioner

4  telephoned her to say that if she told the family or his wife, he would kidnap her and take her with

5  him.

6          Later, the victim told a counselor at school what had happened.  San Jose Police Detective

7  Michael Wharton interviewed the victim at school.  She described having sex with petitioner in the

8  van, the bathroom, and petitioner's bedroom, as well as many of the other incidents of petitioner's

9  touching of her private parts and breasts and asking her to touch his penis described above.  The

10  victim agreed to make a pretext phone call to petitioner from the police department.  The recording

11  was played for the jury.  The victim was crying as she talked to petitioner and complained that he

12  had sex with her in the van and in the bedroom.  Petitioner asked her to "just let it go" and not let

13  "anything happen between the family."  Petitioner said it was a mistake and that he was sorry, "so

14  just let it go."  He said, "Oh, can you just let everything go, please? . . . I beg you.  Okay?  Can we

15  agree?  Let's do this between you and me, alright [sic]?"  When she expressed outrage that she was

16  "a little girl" when he started having sex with her, petitioner responded, "[w]ell, it's just your

17  emotions."  She asked why petitioner had sex with her when she was younger, and he said, "I don't

18  know."  He admitted what he did was wrong and he made a mistake.

19  **D.    DEFENSE**

20          A.T. testified that the victim stayed with her and her family on many occasions and that she

21  never noticed anything unusual between petitioner and the victim.  Grandma testified that the victim

22  slept with "another granddaughter named [M.]" in an upstairs bedroom.  Grandma was not on

23  friendly terms with the victim and she stated, "I feel like she's a bad girl."  She did not see the victim

24  touch or push petitioner, and she never saw him touch her or be alone with her.

25          Petitioner's 17-year-old son, V.T., testified that when the victim to visit she would in the

26  same room as the other kids, in a big bed with his sister and youngest brother, while his parents

27  would sleep downstairs.  When V.T. was eight or nine, he normally went to bed around midnight or

28

United States District Court
For the Northern District of California

1:00 a.m. and got up at 5:30 or 6:00 a.m. to watch his "show ... Rug rats, [ sic ] cartoons." He never saw petitioner do anything sexually inappropriate to the victim and she never said she was afraid of him. Petitioner's 15-year-old daughter, M.T.S., also testified that the victim did not appear afraid of petitioner, was always playful with him, and that she never saw petitioner touch the victim in a sexual manner. M.T.S. and the victim were very close, and were always together. She never saw her father and the victim together in the early morning hours, and her parents never slept in an upstairs bedroom.

Petitioner presented two character witnesses who testified that they knew him well, saw him at Buddhist services and Cambodian social functions, and considered him honest.

William Van Cleave, the defense investigator, testified that he interviewed the victim twice. She told him that when petitioner had sexual intercourse with her in her brother's room, he used a condom, and that when defendant made her have sexual intercourse with him, it was painful. Petitioner also told her to be quiet during sex, and she told him that she did not want him touching her or doing these things to her. She described telling petitioner during intercourse that it hurt and "he said he was going to still force himself inside of her." She told Van Cleave that she was being blamed for breaking up the family.

Petitioner testified that the victim sometimes called A.T. and asked to visit when she was alone and her parents were not home. He said that she did not come every summer – he did not remember her being at his home in the summer of 1997 or from 2001 to 2004, but when she did come, she would stay from four to six weeks. Sometimes she slept downstairs, but most of the time she slept on the floor in the big bedroom with the two big children, and petitioner also slept on the bed in that room with his wife. She slept both upstairs and downstairs, but always with his daughter and older son. She never slept alone with him.

In 1999, she became more playful, pushing and pinching him. He did not touch her breasts or vaginal area nor did he have any sexual contact with her. In the year 2000, the victim had started to develop breasts and she became more aggressive in pushing and pinching him, but he never touched her breasts or vaginal area until one morning in June 2000, when he got up about 4:20 a.m.

1   to go to work.  The victim was in his way, so he tried to push her with his foot.  She woke up and

2   moved sideways, and petitioner stepped over her and got his clothes.  As he went toward the

3   bathroom, the victim pinched his ankle, but he pushed her hand away with his foot and continued

4   into the bathroom.

5   The victim followed him, pushed him into the bathroom and began pinching his thigh, legs,

6   and face.  He tried to push her away but she would not stop.  He put his hand on her breast and

7   started to fondle it and she pulled her pants down.  He resisted, but she kept stroking his neck, face,

8   and head, until he ran downstairs to the half-bath, and then left for work.  In February 2001, when

9   petitioner was staying at the victim's parents' house on weekdays, he gave the victim a ride from San

10  Jose to Stockton.  The victim still kept pinching and pushing him when they were alone.  He tried to

11  stop her, but she would not, so he pulled over and tried to push her off, but she would not stop.  He

12  put his hand on her breast and she stroked his face, but when a sheriff's deputy drove by, he started

13  the van and drove off.

14  Petitioner testified that he did not deny the victim's accusations in the pretext call because "I

15  didn't think about that," "I couldn't think of any other answer," "I didn't think of any other question-I

16  mean answer," "I didn't think of that," "I didn't think of anything, specific answer," "I couldn't think

17  of any other answer," and "I didn't think of it."  Petitioner testified that the victim held him

18  responsible for her brother's death and that she hated him.

19  Petitioner's first day of testimony ended with admissions of only touching the victim's breast

20  and nothing more.  However, on his second day of testimony, after admitting sexual intercourse in

21  the bathroom in June 2000, he stated he had been too ashamed and embarrassed the day before to

22  testify to it in front of his family.  He was admitting it then because it was the truth.  He testified that

23  the victim followed him into the bathroom and removed her own clothes and he had sexual

24  intercourse with her.  He testified that he believed Victim wanted to have sex with him and that she

25  never said anything to suggest otherwise and that if she had said "no," he would not have had sex

26  with her.  He also admitted that they had sex in the van in February 2001.  She removed her own

27  clothes and stroked his penis and then engaged in sexual intercourse with him.  She never said or did

28

United States District Court
For the Northern District of California

anything to suggest that she did not want to have sex with him, and he did not threaten her.  He had never harmed or disciplined her in the past, and was not sexually attracted to the victim.  He had never touched her breasts or vaginal area for the purpose of sexual arousal.

In the summers between 1996 and 1998, when the victim visited, petitioner would play with her just like he played with his own children.  He denied touching either her breasts or vaginal area to arouse himself or to arouse her.  Petitioner denied attending the victim's 15th birthday party.

## ANALYSIS

### A.   STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. 2254(d).  The first prong applies both to questions of law and to mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 09 (2000), while the second prong applies to decisions based on factual determinations, *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529 U.S. at 412 13.  A state court decision is an "unreasonable application of" Supreme Court authority, falls under the second clause of 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   the writ.  *See id.* at 409.

2       "Factual determinations by state courts are presumed correct absent clear and convincing

3   evidence to the contrary."  *Miller El*, 537 U.S. at 340.  This presumption is not altered by the fact that

4   the finding was made by a state court of appeals, rather than by a state trial court.  *Sumner v. Mata*, 449

5   U.S. 539, 546 47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th

6   Cir. 2001).  A petitioner must present clear and convincing evidence to overcome Section 2254(e)(1)'s

7   presumption of correctness; conclusory assertions will not do.  *Ibid*.

8       Under 28 U.S.C. ' 2254(d)(2), a state court decision "based on a factual determination will not

9   be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in

10  the state court proceeding."  *Miller El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107

11  (9th Cir. 2000).

12      When there is no reasoned opinion from the highest state court to consider the petitioner's claims,

13  the court looks to the last reasoned opinion, which in this case is that of the California Court of Appeal.

14  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 06 (1991).

15  **B.   ISSUES PRESENTED**

16      As grounds for federal habeas relief, petitioner claims that (1) the trial court violated his right

17  to due process by failing to properly respond to the jury's question about "consent," and that trial

18  counsel was ineffective for failing to request a further instruction on the meaning of "consent"; (2)

19  the trial court violated his right to due process when it failed to instruct the jury, sua sponte, on the

20  definition of the term "menace;" (3) the trial court violated his right to due process when it failed to

21  instruct the jury in accordance with *People v. Dewberry*, 51 Cal. 2d 548 (1959); and (4) his right to

22  due process was violated when the prosecutor elicited inadmissible evidence, and petitioner's

23  counsel was ineffective in failing to object to this evidence.

24      **1.   Jury Instructions**

25      Petitioner's first three claims assert various errors by the trial court in instructing the jury, in

26  violation of petitioner's right to due process.

27       A challenge to a jury instruction solely as an error under state law does not state a claim

28

8

United States District Court
For the Northern District of California

1  cognizable in federal habeas corpus proceedings.  See *Estelle v. McGuire*, 502 U.S. 62, 71-72

2  (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that

3  the ailing instruction by itself so infected the entire trial that the resulting conviction violates due

4  process.  *Ibid.*  The instruction may not be judged in artificial isolation, but must be considered in

5  the context of the instructions as a whole and the trial record.  *Ibid.*  In other words, the court must

6  evaluate jury instructions in the context of the overall charge to the jury as a component of the entire

7  trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982).

8         In order to show a due process violation, a petitioner must show both that the confusion was

9  ambiguous or erroneous ambiguity and a "reasonable likelihood" that the jury applied the instruction

10  in a way that violates the Constitution.  *Waddington v. Sarausad*, 129 S. Ct. 823, 831 (2009).  A

11  determination that there is a reasonable likelihood that the jury has applied the challenged

12  instruction in a way that violates the Constitution establishes only that a due process violation has

13  occurred.  *Calderon v. Coleman*, 525 U.S. 141, 146 (1998).  If an error is found, a federal court also

14  must determine that the error was prejudicial in that it had a substantial and injurious effect or

15  influence in determining the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

16              **a.    Consent**

17         Petitioner's defense to count two, aggravated sexual assault on a child based, was that the

18  victim consented to sex.  In his first claim, petitioner argues the court's instructions and answer to a

19  question from the jury during deliberations were confusing on the issue of consent.  He also faults

20  counsel for not seeking and obtaining better instructions on this issue.

21         Under California law, consent is a defense to the aggravated sexual assault charge in count

22  two, which in this case was based on the predicate offense of forcible rape (Exh 1 at 13, 15-16 ).

23  Pursuant to CALCRIM No. 1000, the trial court instructed the jury that one of the elements of

24  forcible rape is that "[t]he female did not consent to the intercourse"; that in order to "consent, a

25  female must act freely and voluntarily and know the nature of the act"; that petitioner would not be

26  found guilty of rape if "he actually and reasonably believed that the female consented to the

27  intercourse"; and that the prosecution must prove beyond a reasonable doubt that petitioner did not

28

9

**United States District Court**
For the Northern District of California

1   actually and reasonably believe that the victim consented (*id.* at 14).  By contrast, as instructed by

2   the trial court, California does not allow consent as a defense to the charges in counts three (lewd

3   and lascivious acts on a child age 14 or 15 who was at least 10 years younger than the defendant)

4   and four (lewd and lascivious acts on a child under 14 years of age) (*id.* at 14-15).

5          Petitioner argues that the instructions that consent is a defense to count two but not to counts

6   three and four confused to the jury.  He points to the fact that during deliberations, the jury sent the

7   following question to the trial judge regarding count two regarding: "The law refers to a 'woman'

8   giving consent. Can a 13 year old give consent at all by law?" (*id.* at 15).  The trial court responded,

9   "Please refer to instruction # 1000 on page 21. 'Consent' as there defined refers to any female."

10  (*ibid.*).   The jury had been deliberating for 35 minutes when it sent the question, and then reached a

11  verdict after deliberating for about one more hour after the weekend recess (*id.* at 17).   Petitioner

12  argues that the trial court should have resolved the jury's question by responding "yes, a 13 year old

13  <u>can</u> give consent" (Pet. 6b–6c).

14          The California Court of Appeal denied petitioner's claim based on the following reasoning:

15          In reading the instructions given here, we see that the CALCRIM No. 1000
        rape instruction referred to "a" or "the female" everywhere except in the statement,
16      "Intercourse is accomplished by fear if the woman is actually and reasonably
        afraid...." (Italics original.) The trial court read the instructions verbatim to the jury
17      before it retired, and the written instructions were available to the jurors in the jury
        room. CALCRIM No. 1000 is the only source for the word "woman." From the
18      evidence of the jury's written questions to the court, it appears they gave a close
        reading to the documents provided by the court, quickly noting the discrepancy in the
19      terminology used in the instructions ("female" and "woman") and the count 3 verdict
        form's typographical error referring to a child under 14 when the form should have
20      conformed to the "information packet's" "child under 14 or 15."

21          Consequently, the jury's reference to "the law" in its question ("the law refers
        to a 'woman' giving consent. Can a 13 year old ... ?") must refer only to CALCRIM
22      No. 1000 where the word "woman" is introduced. The trial court's answer referring
        the jurors back to CALCRIM No. 1000 and stating that " 'Consent' ... refers to any
23      female" is directly on point in the tight frame of reference presented by the question.

24          Defendant's concern whether the court adequately explained to "the average
        lay-person unfamiliar with the intricacies of the law" the "counter-intuitive ...
25      concepts involved in the forcible rape of a child" versus the child's incapacity to give
        legal consent to lewd acts on a child under 14 or 14 or 15 (see counts 2 and 4), is
26      unfounded. The jury did not express confusion about a minor's ability to give actual
        consent to sexual intercourse but inability to give legal consent to a
27      differently-defined crime, lewd conduct with a child. Here, the court precisely
        answered the question asked related to a discrepancy in the terminology in a specific

28

10

instruction on the elements of a particular crime. The court properly instructed the jury and responded precisely and completely to the question asked. There was no error. Counsel was not ineffective for failing to request further instructions on the concept of "consent."

(*Id.* at 17-18).

The California Court of Appeal's reasoning is sound.  As the state court correctly noted, the trial court's response precisely answered the jury's question when it referred the jurors back to CALCRIM No. 1000 and explained that "'Consent' . . . refers to any female" (*id.* at 18).  The court's answer of "any female" plainly includes a female child under 14, which any reasonable juror would be able to understand.  The instructions on consent, therefore, especially in light of the trial court's unambiguous answer to the jury's question, did not render the trial fundamentally unfair in violation of due process, nor was there any need for counsel to seek further instructions on the issue.  The state courts' rejection of this claim was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to federal habeas relief on this claim.

### b.    Menace

Petitioner's second claim is that the trial court denied his right to due process and a fair trial when it failed to sua sponte define the term menace.  Petitioner contends that the word "menace" has a "particular legal meaning" and, therefore, the trial court should have defined or explained the term when it instructed the jury that forcible rape is accomplished "by force, violence, or menace" (Pet. 6J).

The California Court of Appeal denied petitioner's claim based on the following reasoning:

> The rape statute defines "menace" to mean "any threat, declaration, or act which shows an intention to inflict an injury upon another."  (§ 261, subd. (c)). . . .

> A brief check of dictionaries shows that the noun "menace" is commonly defined as "a show of intention to inflict harm" [citation omitted]  . . . While , as [petitioner] says in his brief, "menace" can also mean "an impending evil" and "a troublesome or annoying person" (citation omitted), those definitions do not fit the context.  Thus it is highly unlikely that jurors, persons who understand and speak English, would think that the question to be decided was if [petitioner] accomplished an act of sexual intercourse by use of "a troublesome or annoying person" or "an impending evil."  "Inasmuch as the statutory definition[] of . . . 'menace' do[es] not differ significantly from the nonlegal, common meanings of [that] word[][.] [T]he trial court had no sua sponte duty to instruct the jury on the definition[] of . . . menace." [Citation omitted].  There was no error.

11

United States District Court
For the Northern District of California

(*id.* at 19–20).

The state appellate court's decision was reasonable.  Based on the dictionary definitions of the word "menace," its nonlegal and legal meanings in the context of this case were not significantly different because there is no likelihood that the jury would think that petitioner used an "impending evil" or a "troublesome or annoying person" to have sexual intercourse with the victim. Consequently, there is no reasonable likelihood that the trial court's failure to define the term menace sua sponte caused the jury to apply the instructions in a manner that violated the constitution.  The state courts' rejection of this claim was neither contrary to nor an unreasonable application of federal law, and petitioner is not entitled to federal habeas relief on this claim.

**c.   *Dewberry* Instruction**

Petitioner also claims that the trial court denied his right to due process when it failed to instruct the jury, under *People v. Dewberry*, 51 Cal. 2d 548 (1959), that if they were convinced beyond a reasonable doubt that petitioner committed a crime, but they had a reasonable doubt as to whether he committed the greater or lesser offense, they were required to convict him of only the lesser offense.  Specifically, petitioner argues, the court had a sua sponte duty to instruct the jury that lewd and lascivious conduct (Cal. Pen. Code § 288(a)) was an uncharged lesser-included offense of both the continuous sexual conduct charged in count one and the aggravated sexual assault of a child charged in count two.

To begin with, petitioner's argument that the trial court failed to comply with *Dewberry* does not state a claim for the violation of due process.  As indicated above, a challenge to a jury instruction solely as an error under state law, such as the state court decision in *Dewberry*, does not state a claim cognizable in federal habeas corpus proceedings.  *Estelle v. McGuire*, 502 U.S. 62, 67-68, 71-72 (1991) (federal habeas corpus relief is not available for violations of state law or for alleged error in the interpretation or application of state law).  Moreover, petitioner's argument that the trial court failed to instruct the jury sua sponte on lesser-included offenses also fails to state a viable claim for habeas relief because the failure of a state trial court to instruct on lesser-included offenses in a non-capital case, such as this one, does not present a federal constitutional claim.  *See*

*Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000).

Petitioner's argument in his traverse that he had a constitutionally protected liberty interest in a an instruction under *Dewberry* also fails. Under limited circumstances, a state statute may create a "liberty interest" protected by the federal right to due process that is enforceable in federal habeas corpus. *See Bonin v. Calderon*, 59 F.3d 815, 841 (9th Cir. 1995). Petitioner does not assert that any state statute entitles him to have a trial court give the instruction outlined in *Dewberry* sua sponte. In any event, if the state permits its appellate courts to cure the deprivation of state law, as the state appellate court could do if an error had occurred, any state-created right constitutes at most a "qualified" liberty interest. *Arreguin v. Prunty*, 208 F.3d 835, 837-47 (9th Cir. 2000) (citing *Clemons v. Mississippi*, 494 U.S. 738, 746 (1990)). Here, the state appellate courts' finding the instruction under *Dewberry* unnecessary in light of the other instructions satisfied any qualified liberty interest petitioner may have had in the instruction. *See id.* at 837 (state appellate court's application of a harmless error analysis sufficient to satisfy the standard for state-created qualified liberty interests under *Clemons*).

Accordingly, petitioner is not entitled to federal habeas relief on this claim.

### 2.   **Prosecutorial Misconduct**

Petitioner claims that the his right to due process and a fair trial were denied when the prosecutor argued that it was impossible for victim to consent to sexual intercourse with petitioner, and elicited testimony from Detective Wharton vouching for the credibility of people, such as the victim in this case, who participate in pretext telephone calls with the police.

### a.   **Consent**

The prosecutor made an argument about consent in rebuttal to defense counsel's argument that the victim did not protest or indicate fear (Exh. 1 at 25). The prosecutor stated that "Now [defense counsel] also says [that] [Victim] did not let the petitioner know that she did not consent. First of all, she doesn't have to let him know. She has to be–she doesn't have to tell him outwardly. He can read the signs of her. And what's the first obvious sign. She is 13. She can't consent legally. I mean, how could she consent? That's impossible. So let's just start with that" (*id.* at 26).

United States District Court
For the Northern District of California

1   Petitioner asserts that, by making this statement, the prosecutor implied that it did not have to prove

2   lack of consent, or that it was proven simply by establishing the uncontroverted fact that the victim

3   was 13 years old at the time of alleged acts, withdrawing a critical element from the jury's

4   consideration (*id.* at 27).

5          Prosecutorial misconduct is cognizable in federal habeas corpus.  A defendant's due process

6   rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v.*

7   *Wainwright*, 477 U.S. 168, 181 (1986).  Under *Darden*, the first issue is whether the prosecutor's

8   remarks were improper; if so, the next question is whether such conduct infected the trial with

9   unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim

10  is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's

11  remarks so infected the trial with unfairness as to make the resulting conviction a denial of due

12  process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted), cert. denied, 516 U.S.

13  1017 (1995).

14         The California Court of Appeal rejected petitioner's argument based on the following

15  reasoning:

16         "'[I]t is improper for the prosecutor to misstate the law generally [citation], and
           particularly to attempt to absolve the prosecution from its prima facie obligation to
17         overcome reasonable doubt on all elements.' " (People v. Hill (1998) 17 Cal.4th 800,
           829.) Consent is an issue in a prosecution for rape and the government must prove the
18         victim's nonconsent beyond a reasonable doubt along with all other elements of the
           corpus delicti. (People v. Key (1984) 153 Cal.App.3d 888, 895.) Lack of consent
19         must be proved beyond a reasonable doubt even when the victim is a child. (People v.
           Young (1987) 190 Cal.App.3d 248, 257.)
20
           The prosecutor's argument, taken in context, does not withdraw a critical element
21         from the jury's consideration or render the trial unfair. The argument presented by
           both sides was focused on whether Victim's conduct manifested a lack of actual
22         consent to the act of sexual intercourse. There was no issue whether Victim gave
           legal consent, and except for the prosecutor's brief interjection that Victim could not
23         consent legally, the thrust of the parties' arguments was whether Victim did or did not
           manifest a lack of consent. There was no prosecutorial misconduct.
24
25  (Exh.1 at 27–28).

26         The state appellate court's decision was a reasonable application of federal law.  "Arguments

27  of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v.*

28  *California,* 494 U.S. 370, 384 (1990).  The trial court correctly instructed the jury that petitioner

14

United States District Court

For the Northern District of California

would not be guilty of count two if the jury found that the victim consented to the intercourse. When comparing jury instructions from the trial court with any apparently conflicting statement of the law by the prosecutor, the jury is presumed to follow the instructions to do what the judge says and not what the argument of counsel follows.  As the jury was correctly instructed by the trial court on the issue of consent, any misstatement of the law by the prosecutor about consent would not have rendered the trial fundamentally unfair.  Furthermore, the debate when the prosecutor made his remarks was whether or not victim actually, not legally, consented to the sexual conduct (Exh. 1 at 28).  Even assuming that the prosecutor's remark asserting that it was impossible for victim to consent was improper, the lone remark was surrounded by comments speaking toward whether the victim in fact consented in this case.  Defense counsel asserted that the victim cooperated in both incidents of sexual intercourse, that there were no threats, force, or resistance involved, and that no past behavior suggested that she was in danger or afraid of petitioner (*id.* at 25).  In the context of this discussion, it was clear that consent was an element for the jury to decide, and the state appellate court could reasonably conclude that the prosecutor's remark did not so infect the trial with unfairness as to make the resulting conviction a denial of due process.

### b.    Inadmissible Testimony

At trial, the prosecutor examined Detective Wharton, the detective responsible for helping the victim record the telephone call with petitioner, and the following testimony resulted:

> "Q: Did you tell her before she got to the police department . . . what was going to happen there? [P] A: Well, I explained to her . . . that I would like her to do the pretext call if she was willing. [P] Q: Did you tell her why? [P] A: Yes. [P] Q: What did you say? [P] A: I told her that in cases like this it's often a very good tool and that suspects will often say things that will incriminate them when they don't know the call is being recorded and that the police are listening or involved. [P] Q: Did you mention anything to her about the idea of the truth? [P] A:I commonly tell the victims in my cases that the truth usually comes out during the pretext call because the suspect is unaware of what's going on. [P] Q:Why? . . . [P] A:Well, my training and experience has showed me that the victims that are willing to do the pretext call are often those that are most likely to see the prosecution all the way through to the end phase, and also it's kind of--sometimes it can determine whether the victim is being deceptive or truthful with me. [P] Q:Did  you mean by their readily [sic] and willingness to engage in that pretext call? [P] A:Yes. [P] Q:What was [Victim's] response? [ P] A: [Victim] was willing to do it without hesitation."

(*id.* at 28–29).  Petitioner contends that this testimony sent a clear inference to the jury that, because

1   the victim helped Detective Wharton, the victim must be honest and truthful.  Petitioner asserts that

2   these statements lowered the prosecution's burden of proof, violating his right to due process, and

3   that counsel was ineffective in failing to object to them.

4       The California Court of Appeal denied petitioner's claim explaining:

5   It is misconduct for a prosecutor to intentionally elicit inadmissible testimony (*People v. Chatman* (2006) 38 Cal.4th 344, 379-380) and the prosecutor has a duty to see that

6   his or her witness " 'volunteers no statement that would be inadmissible and especially [be] careful to guard against statements that would also be prejudicial.'

7   "(*People v. Schiers* (1971) 19 Cal.App.3d 102, 113.)  An officer's opinion of the veracity of a witness is inadmissible. (*People v. Sergill* (1982) 138 Cal.App.3d 34 (

8   *Sergill* ).) . . .  Wharton's opinion as to the veracity of those who report crimes was not admissible as the opinion testimony of a lay witness (Evid.Code, § 800), and it

9   was irrelevant as not having a tendency in reason to prove or disprove a disputed fact that is of consequence to the action, namely, Victim's credibility. (*Id.*, §§ 210, 780;

10  *Sergill, supra*, 138 Cal.App.3d at p. 40.)

11  . . .

12  Wharton's quoted testimony was inadmissible. His "training and experience" on whether "victims that are willing to do the pretext call . . . can determine whether the

13  victim is being deceptive or truthful with me" is inadmissible and irrelevant as stated above. (*Sergill, supra*, 138 Cal.App.3d at ¶. 39-40.) Wharton was not an expert

14  witness on whether "the truth usually comes out during the pretext call because the suspect is unaware of what's going on." First, he might believe and hope that the

15  suspect is unaware of what was going on, but he had no personal knowledge of the suspect's state of mind and could not testify to it. Second, he might believe and hope

16  that the statements made on the tape by the victim and the suspect would be the "truth," but it is the fact finder, not the witnesses, who must draw the ultimate

17  inferences from the evidence. (*People v. Melton* (1988) 44 Cal.3d 713, 714.)

18  Furthermore, Wharton's belief that "sometimes" a victim's readiness and willingness to make a pretext call "can determine whether the victim is being deceptive or

19  truthful with me" was improper subject matter for an expert opinion because not based on a subject that is sufficiently beyond common experience that it would assist

20  the trier of fact, and not based on matter that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his

21  testimony relates. (Evid. Code, § 801.)

22  . . .

23  In this case, defendant cannot show prejudice. There is no reasonable probability that if counsel had objected to this line of questioning and the jury was admonished, that

24  the outcome would have been more favorable to defendant. The evidence that Victim did not actually consent to sexual intercourse was strong, if believed. Although she

25  did not say "no" on every occasion, she cried, she pushed defendant away, she avoided him, and on one occasion, she told defendant it hurt and "he said he was

26  going to still force himself inside of her." The parties thoroughly argued the issues of consent and Victim's credibility. Defendant's credibility was significantly damaged

27  by his admissions of lying during the first day of testifying.  The jury observed the demeanor of all the witnesses while they testified. It was not reasonably likely that

28

1

2

> the jury would have acquitted defendant of count 2 if Wharton had not testified to his
> belief about the truth-extracting capabilities of pretext calls and this Victim's
> unhesitating cooperation.

3   (Exh. 1 at 30–32).

4       A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

5   Amendment right to counsel, which guarantees not only assistance, but effective assistance of

6   counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The benchmark for judging any

7   claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of

8   the adversarial process that the trial cannot be relied upon as having produced a just result.  *Ibid.*

9       Although Detective Wharton's testimony as to the victim's truthfulness based on her

10  participation in the pre-text calls was inadmissible, the state court reasonably determined such

11  testimony was not prejudicial.  As described by the California Court of Appeal, Wharton's testimony

12  on this issue was not a significant factor because the evidence against petitioner was very strong.

13  The victim gave extensive and detailed testimony about petitioner's sexual abuse that was consistent

14  with her prior accounts to her brother and the police.  Her account was also bolstered by the pre-text

15  phone call in which petitioner, when questioned about the sexual abuse, did not deny it.  Petitioner's

16  credibility was seriously undermined when he admitted in his second day of testimony that he had

17  been lying in his earlier testimony and that he had in fact had intercourse with the victim when she

18  was a minor.  He was also unable to give any coherent explanation for his statements during the pre-

19  text phone call.  In addition, Wharton's testimony did not preclude defense counsel from making all

20  of its arguments challenging the victim's credibility.  In the context of the overwhelming evidence

21  against petitioner at trial, there was no reasonable likelihood that Wharton's testimony made a

22  difference in the outcome of the trial.  As a result, the state courts reasonably concluded that

23  counsel's failure to object to the testimony was not prejudicial under Strickland.

24       For the same reasons, namely the overwhelming evidence against petitioner, the

25  prosecutor's eliciting Wharton's testimony did not have a substantial and injurious effect on the

26  jury's verdict, the prejudice standard applicable to habeas review of claims of prosecutorial

27  misconduct.  *See Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from

28

prosecutorial misconduct because it "could not have had substantial impact on the verdict" under

*Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

Accordingly, petitioner is not entitled to relief on this claim.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals.

The Clerk shall enter judgment in favor of respondent, and close the file.

**IT IS SO ORDERED**.

DATED: September __30__, 2010

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

G:\PRO-SE\WHA\HC.08\THAING3309.RUL.wpd

**United States District Court**
For the Northern District of California

18